Coos
No. 89-325

ERWIN L. PARKHURST

v.

MILDRED D. GIBSON (PARKHURST)

April 13, 1990

*Bergeron, Hanson & Bornstein P.A.*, of Berlin (*James E. Michalik* on the brief and orally), for the plaintiff.

*McKean, Mattson & Mulligan P.A.*, of Laconia (*Julia M. Nye* on the brief and orally), for the defendant.

JOHNSON, J.   The plaintiff appeals the Superior Court's (*Perkins,* J.) decision, approving the recommendation of a Master (*Larry B. Pletcher,* Esq.), to award the defendant in this divorce action a prop-

erty settlement of $35,000 and alimony of $500 per month. At issue on appeal is the application of the parties' antenuptial agreement to their divorce proceedings. For the reasons stated below, we affirm the trial court's ruling that the agreement was not made in contemplation of divorce and was therefore not applicable.

Because it is important to view a contract as a whole, we set forth the entire antenuptial agreement:

"This agreement made this fourteenth day of November, 1980, by and between Erwin L. Parkhurst of Colebrook in the County of Coos and State of New Hampshire, hereinafter referred to as party of the first part, and Mildred D. Gibson of Pittsburg in said County of Coos and State of New Hampshire, hereinafter referred to as party of the second part,

WITNESSETH:

WHEREAS, a marriage is about to be solemnized between the parties to this agreement, and

WHEREAS, each of said parties has consented and agreed, each with the other, that neither of them shall have possession nor acquire any interest or estate in any property, real or personal, or right of action, of which the other of them is, or shall be, at the time of said marriage seized or possessed, and

WHEREAS, the parties hereto, in consideration of said marriage, have made a full and complete disclosure to each other as to their respective worldly possessions and each has full knowledge as to the extent and probable value of the real estate and other possessions of the other, and

WHEREAS, said parties are desirous of making a settlement one upon the other in lieu of all rights of dower, homestead, distributive share and all other marital rights by virtue of the laws of the State of New Hampshire, or of any other state or country;

NOW THEREFORE, in consideration of the respective agreements of each party to the other and the settlement each has made upon the other and acknowledging that each has made a full disclosure to the other as to their respective worldly possessions, it is mutually agreed by and between the parties hereto as follows:

1. The party of the second part agrees to and with the said Erwin L. Parkhurst that in the event of his death, testate or intestate, she will not contest his Will, if any, nor make any claim to his estate whatsoever; that she will accept such provision as may be made for her in his said Will and further that it shall be the same so far as the parties to this instrument are concerned as if he had died leaving no widow surviving him, even in the event of her surviving him.

2. The party of the first part agrees to and with the said Mildred D. Gibson that in the event of her death, testate or intestate, he will not contest her Will, if any, nor make any claim to her estate whatsoever; that he will accept such provision as may be made for him in her said Will and further that it shall be the same so far as the parties to this instrument are concerned as if she had died leaving no widower surviving her, even in the event of his surviving her.

3. It is mutually agreed that in case either of the parties desires to mortgage or sell and convey his or her real estate or personal estate, each one will join in the deed of conveyance or mortgage, as may be necessary to make the same effectual.

4. The parties mutually agree and do hereby release, convey and quitclaim unto the other all their respective interest that he or she may acquire by the said intermarriage in and to the property of the other, now in his or her possession, or what each may hereafter acquire renouncing forever all claims, either in law or in equity, of curtesy, homestead, surviving or otherwise; to the end that neither party shall have or claim any interest in or to the property now owned or which may hereafter be acquired by the other.

5. It is mutually declared that it is the intention of the parties to this agreement that by virtue of their prospective marriage neither one shall have nor acquire any right, title or claim in and to the real or personal estate of the other party, but that the estate of each shall descend to or vest in his or her heirs at law, legatees, or devisees, as may be prescribed by his or her last will and testament or

by the law of the state in force, as though no marriage had taken place between them.

This agreement shall be construed to come within the provisions of Sections 15 and 16 of Chapter 560 of the Revised Statutes Annotated of New Hampshire, 1955, and any amendments thereof, and shall be given in full force and effect and shall be enforced as provided in said statutes, it being the desire of the parties hereto that their respective rights to the estate of the other be determined, fixed and limited by this agreement; and that this agreement shall be binding upon their respective heirs and legal representatives.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals at Berlin, New Hampshire, this fourteenth day of November, 1980."

The parties were married on November 25, 1980. Mildred D. Gibson (Parkhurst) (hereinafter Mildred) was the second wife of Erwin L. Parkhurst (hereinafter Erwin), and Erwin was Mildred's fourth husband. Mildred lost one of her prior husbands through death; the other two marriages ended in divorce, as did Erwin's first marriage. Both parties have children born of these prior marriages.

Erwin and Mildred both testified at the March 21, 1989 hearing that they signed the antenuptial agreement at least in part to protect the inheritance rights of their respective children. Mildred repeatedly testified that the agreement was made in contemplation only of death, and not of divorce. Erwin, however, testified that the agreement was meant to keep the parties' financial lives forever separate, no matter how the marriage ended. The master concluded that "both parties have testified that the circumstance of divorce was not within their contemplation and was not mentioned to counsel in preparation or execution of this agreement."

On October 7, 1988, after Erwin and Mildred had filed for divorce, the parties' attorneys signed an "AGREED STATEMENT OF FACTS" which provided, among other things, that: (1) the attorney who drafted the antenuptial agreement had previously represented Erwin, but had never previously represented Mildred; (2) the attorney believed he was representing both parties in effecting a mutually desired agreement and that, as a consequence, Mildred was neither advised to, nor did she, obtain independent counsel; (3) the parties represented to the attorney that the purpose of the antenuptial agreement "was to protect their respective children's interests in

their estates"; (4) the attorney explained to Erwin and Mildred "that neither party would acquire any interest in the property of the other unless an inter vivos gift was made to the other"; and (5) the attorney, during the preparation and execution of the agreement, "did not discuss divorce as a probable or possible cause for the termination of the marriage."

Erwin admitted at the final hearing that neither party discussed the financial consequences of ending the marriage by divorce or mentioned the possibility of divorce during the time the antenuptial agreement was proposed, drafted, considered, and signed. The master found that the agreement did not apply to the divorce proceeding. The master further found that the antenuptial agreement did not control this divorce because the agreement "was prepared by [Erwin's] prior attorney who purported to represent both parties"; that Mildred "was not advised to, nor did she receive independent counsel"; and that, finally, "she had no idea as to the value of [Erwin's] assets and no formal disclosure of assets was made to her." The master awarded Mildred a $35,000 property settlement and $500 per month in alimony. The alimony award is subject to change upon Mildred's receipt of social security benefits and will terminate when she dies or remarries.

Erwin raises three issues on appeal. First, he argues that the antenuptial agreement applies to divorce as well as to death, and that therefore Mildred should not have been awarded a property settlement or alimony. Second, Erwin argues that, assuming the agreement does not apply to the divorce, the master abused his discretion in awarding Mildred a $35,000 property settlement because the parties intended to keep their financial lives separate during and after their marriage. Third, Erwin argues that given Mildred's work history, assets, and contributions to the marriage, the master abused his discretion in awarding Mildred $500 per month in alimony.

## I. *The Antenuptial Agreement*

The master was correct in ruling that the parties' antenuptial agreement does not apply to their divorce. We therefore do not need to address Mildred's argument that the agreement is unenforceable because it violated the fairness standards set forth in our recent decision in *MacFarlane v. Rich (MacFarlane)*, 132 N.H. 608, 614, 567 A.2d 585, 589 (1989).

Our task in interpreting this antenuptial agreement is to ascertain the parties' intent, *see R. Zoppo Co. v. City of Dover*, 124

N.H. 666, 671, 475 A.2d 12, 15 (1984), as expressed in the written contract; *see also* 4 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 610 (3d ed. 1961). The parol evidence rule cautions us that, absent fraud, duress, mutual mistake, or ambiguity, we must restrict our search for the parties' intent to the words of the contract. 4 S. WILLISTON §§ 629, 631.

> "As a matter of substantive law, where the parties to an agreement adopt a writing as the final and complete expression of that agreement an integration results; the act of embodying those terms in the writing becomes the contract. Under such circumstances, extrinsic evidence to vary the terms of the written instrument is excluded, because the writing is the contract itself."

*Shivers v. Liberty Building-Loan Ass'n*, 16 Cal.2d 296, 299, 106 P.2d 4, 6 (1940).

Erwin's argument that the agreement was made in contemplation of both divorce and death depends on his interpretation of the clause "said parties are desirous of making a settlement one upon the other in lieu of . . . all other marital rights," found in the agreement's fourth "WHEREAS" paragraph. He argues that "all other marital rights" includes property settlement and alimony awards granted upon divorce. Thus, he urges us to apply the agreement to his divorce. We disagree with his position.

At the outset, we note that the term "all other marital rights" is not ambiguous, but simply broad and general in nature. Since plaintiff does not allege fraud, duress, or mutual mistake, we look no further than the words of the agreement to ascertain the intent of the parties. 4 S. WILLISTON §§ 629, 631.

Viewing the agreement as a whole offers little support to Erwin's argument. The five paragraphs setting forth the parties' agreements are particular and specific, and concern only inheritance rights and inter vivos transfers of assets. The words "divorce," "alimony," and "property settlement" do not appear in these provisions, nor anywhere else in the agreement. Immediately following the specific provisions, the agreement states: "This agreement shall be construed to come within the provisions of Sections 15 and 16 of Chapter 560 of the Revised Statutes Annotated . . . ." The sections referred to govern the inheritance rights of surviving spouses. Chapter 458 of the Revised Statutes Annotated, concerning annulment, separation, and divorce, is not referenced in the agreement.

■ The general clause "all other marital rights" could, if read literally, broaden the scope of the agreement far beyond the carefully drafted bounds of its specific provisions. We decline to adopt this approach. The generally accepted interpretive rule is that a general, preliminary clause should not ordinarily take precedence over specific provisions of a contract.

> "Where there is a repugnancy between general clauses and specific ones, the latter will govern; and even if there is no actual repugnancy if the words of the contract are taken literally, yet when from the whole instrument it appears that the purpose of the parties was solely directed towards the particular matter to which the special clause or words relate, the general words will be restrained."

4 S. WILLISTON § 619. *See also* 3 A. CORBIN, CORBIN ON CONTRACTS § 547 (1960). Corbin states that "[a] subsidiary provision should be so interpreted as not to be in conflict with what clearly appears to be the 'dominant purpose' of the contract." *Id.* The "dominant purpose" of the antenuptial agreement is clearly to protect the inheritance rights of the parties' respective children. Since the clause "all other marital rights" is general and appears merely in a "WHEREAS" paragraph, we will not interpret it to include marital rights beyond those particularly described in the agreement. The master correctly determined that the agreement does not apply to divorce proceedings.

## II. *Property Settlement*

Erwin argues that, regardless whether the antenuptial agreement applies to the divorce, the master should not have awarded Mildred a property settlement because the parties intended to keep their financial lives separate. We disagree and hold that the master did not abuse his discretion in making the award.

It should be noted first that, in making his award, the master *did* take into consideration the parties' financial dealings with each other. He states:

> "It is true that the parties to a large extent kept their assets separate and did not expect to share each other's assets which they respectively brought to the marriage. It is therefore inappropriate to divide all assets equally between the parties."

RSA 458:16-a, II (Supp. 1989), concerning property settlement in divorce proceedings, presumes "that an equal division [of marital

property] is an equitable distribution of property," unless an applicable antenuptial agreement exists or some other circumstances make an equal division inequitable.

Although each party retained title to the assets she or he brought into the marriage, the evidence reveals that the parties did not intend to—nor did they in fact—live separate financial lives. Before the marriage, Mildred owned a home and worked full-time as the owner and operator of a lodge business. After the marriage, Mildred discontinued the lodge business, sold her property, and, at Erwin's request, no longer worked outside the home. The parties lived in Erwin's house during their marriage, and Erwin paid all of the household bills, including grocery bills. Mildred in turn maintained the house as a homemaker. During their eight-year marriage, the parties jointly purchased two automobiles, a money market account, an IRA account in Mildred's name, and a real estate investment known as Shelter IV Properties.

During the hearing below, Erwin attempted to elicit from Mildred a statement that she intended to keep her financial life separate from his during their marriage. His attempt failed. After repeated, unsuccessful efforts to have Mildred agree that she intended to keep her financial life separate, Mildred testified:

"Q. At the time of the marriage, you never intended to swap assets, did you?

A. Are you getting to the antenuptial agreement? If you are, then this was prepared to protect our children.

Q. If I can have you just answer my question, Mrs. Parkhurst. You didn't intend to share financially with each other, did you?

A. Naturally I expected to share financially as his wife."

On the other hand, Erwin was adamant about their financial intentions. He testified:

"Q. What would you say the primary reason is?

A. Primary reason, as I understand the agreement, was that her property would remain hers and mine would remain mine regardless of what happened."

The precise value of each of the assets involved in this case is difficult to ascertain. However, the record indicates that the combined assets of the parties was approximately $420,000, and that the master awarded Mildred approximately $155,000 of these combined assets (which included the proceeds from the sale of her home). The

master, insofar as possible, returned to each of the parties the assets (or the proceeds thereof) which they brought into the marriage.

■ Given the financial history of the marriage and the inconclusive intentions of both parties at the time they entered the marriage, we cannot find that the master abused his discretion in making an award of $35,000 to Mildred out of Erwin's assets. A reasonable person could have reached the same decision on the basis of the evidence, and his findings are therefore entitled to stand. *Gelinas v. Metropolitan Prop. & Liability Ins. Co.*, 131 N.H. 154, 164, 551 A.2d 962, 968 (1988).

## III. *Alimony*

Finally, Erwin argues that the master abused his discretion in awarding Mildred $500 per month in alimony. The master's award was too high, he maintains, because of her "assets, her professional history and skills, her eligibility for social security benefits, her minimal contributions to the marriage, and her voluntary unemployment." We disagree.

■ The trial court is in the best position to determine the parties' respective needs and resources; therefore, we can disturb the master's alimony award only where there is a clear abuse of discretion. *Nicolazzi v. Nicolazzi*, 131 N.H. 694, 696, 559 A.2d 1335, 1337 (1989). Since we are unpersuaded that the master abused his discretion, his award is entitled to stand.

In determining whether, and in what amount, to make an award of alimony, a trial court must follow the provisions of RSA 458:19 (Supp. 1989):

"I. Upon motion of either party for alimony payments, the court shall make orders for the payment of alimony to the party in need of alimony, either temporary or permanent, for a definite or indefinite period of time, if it finds that:

(a) The party in need lacks sufficient income, property, or both, including property apportioned in accordance with RSA 458:16-a, to provide for his reasonable needs, taking into account the style of living to which the parties have become accustomed during the marriage; and

(b) The party from whom alimony is sought is able to meet his reasonable needs while meeting those of the party seeking alimony, taking into account the style of living to which

the parties have become accustomed during the marriage; and

(c) The party in need is unable to support himself through appropriate employment at a standard of living that meets his reasonable needs or is the custodian of a child of the parties whose condition or circumstances make it appropriate that the custodian not seek employment outside the home.

. . . .

IV. The court may make orders for alimony in a lump sum, periodic payments, or both. In determining the amount of alimony, the court shall consider the length of the marriage; the age, health, social or economic status, occupation, amount and sources of income, the property awarded under RSA 458:16-a, vocational skills, employability, estate, liabilities, and needs of each of the parties; the opportunity of each for future acquisition of capital assets and income; the fault of either party as defined in RSA 458:16-a, II(l); and the federal tax consequences of the order. The court may also consider the contribution of each of the parties in the acquisition, preservation, or appreciation in value of their respective estates and the non-economic contribution of each of the parties to the family unit."

Mildred presented sufficient evidence for the master to reasonably find that she met the requirements of RSA 458:19, I (Supp. 1989). She testified that, at the time of her marriage, she owned a home, was in good health, and worked a full-time, physically demanding job as owner/operator of a lodge business; she also had experience as a legal secretary. Erwin was earning approximately $20,000 per year, had just bought a house, and had paid the full purchase price of $60,000. In addition, he owned an airplane and a half interest in a hangar. After she married Erwin, Mildred discontinued her lodge business and sold her property. At Erwin's request, Mildred did not work outside her home until several years later, in 1986, when she worked as a town tax collector. She suffered a case of pneumonia that year, however, which caused her to stop working full-time. After the tax collecting job ended, she worked temporarily as a real estate associate, earning approximately $2,000 per year. Her declining health eventually forced her to end her employment altogether. At the time of the hearing, Mildred was 63-years-old, had no earned

income, and owned about $120,000 in assets. Erwin, on the other hand, earned about $50,000 per year and had assets totalling about $300,000.

█ █ Erwin does not dispute Mildred's claims of ill health and presented no evidence at trial to contradict her testimony. Trial courts are necessarily given broad discretion in the assessment of a witness's credibility and in the weighing of testimony. *See Ballou v. Ballou*, 118 N.H. 463, 465–66, 387 A.2d 1169, 1170 (1978). Given Mildred's uncontradicted testimony that her poor health prevents her from working outside her home, in addition to the evidence of the parties' respective assets, we hold that the master did not abuse his discretion in awarding Mildred $500 per month in alimony.

*Affirmed.*

All concurred.