1997 SD 75

**Clarence T. ROTH, Plaintiff and Appellee,**

v.

**Alice E. Thomas ROTH, Petitioner and Appellant.**

**No. 19723.**

Supreme Court of South Dakota.

Considered on Briefs March 25, 1997.

Decided June 25, 1997.

Thomas E. Alberts, Avon, for plaintiff and appellee.

Lee R. Burd and Shelley R. Wieck, Sioux Falls, for petitioner and appellant.

AMUNDSON, Justice.

[¶ 1.] Alice E. Roth (Alice) appeals the trial court's judgment denying her claim against Clarence T. Roth (Clarence) for division of property. We reverse.

**FACTS AND PROCEDURE**

[¶ 2.] Clarence and Alice were married on June 22, 1985. Clarence was sixty-eight years old and Alice was forty-seven years old at the time. On June 10, a few days before they married, they entered into an antenuptial agreement which is the center of this dispute and reads as follows:

THIS AGREEMENT, made and entered into this *10th* day of *June*, 1985, by and between Clarence T. Roth of Parkston, South Dakota, and Alice E. Thomas of Parkston, South Dakota.

WHEREAS, the parties do contemplate legal marriage under the laws of the State of South Dakota; and

WHEREAS, it is their mutual desire to enter into this Agreement whereby they will regulate their relationships toward each other with respect to the property each of them owns and which each of them has an interest in; and

WHEREAS, both are severally possessed of real and personal property in his and her own right, and each have children by former marriages, and it is desired by the parties that their marriage shall not in any way change their legal right or that of their children and heirs in the property of each of them.

NOW, THEREFORE, it is AGREED as follows:

1. That all property of any kind or nature, real, personal or mixed, wherever the same may be found, which belongs to each party, shall be and forever remain the personal estate of said party, including all interest, rents and profits which may accrue therefrom.

2. That each party shall have at all times the full right and authority, in all respects the same as each would have if not married, to use, enjoy, manage, convey, and encumber such property as may belong to him or her.

3. That each party may make such disposition of his or her property as the case may be, by gift or by Will during his or her lifetime as each sees fit; and in the event of the decease of one of the parties, the survivor shall have no interest in the property of the estate of the other, either by way of inheritance, succession, family allowance or homestead or elective share. This waiver is made pursuant to SDCL 30–5A–4 and laws amendatory thereto, after fair disclosure.

4. It is agreed that in case either of the parties desires to mortgage or sell his or her real or personal estate, each will join in the deed of conveyance or mortgage as may be necessary to make the same effectual.

5. Each party shall be responsible to pay for his or her own medical expenses and medical insurance on their persons.

6. It is agreed that in the event that the parties reside in Clarence T. Roth's house located 1 1/2 miles east of Parkston, South Dakota, and in the event that Clarence T. Roth predeceases Alice E. Thomas, she shall have the right to live and remain in the home of Clarence T. Roth for a period of one (1) year from the date of his death.

In the event that the parties desire to live in Alice E. Thomas' house location in Parkston, South Dakota, and in the event that she predeceases Clarence T. Roth, he shall have the right to remain and live in her house for the period of one (1) year from the date of her death.

7. This Agreement is to become effective only upon the date of the marriage of the parties.

8. This Agreement shall be binding upon both of the parties hereto and their respective heirs, legal representatives, and assigns.

9. It is further agreed that this Agreement is entered into with the full knowledge on the part of each party as to the extent and probable value of the estate of the other and of the rights confirmed by law upon each in the estate of the other by virtue of said proposed marriage, but it is their desire that their respective rights to each other's estate shall be fixed by this Agreement.

WHEREFORE, both parties have hereunto set their hands and affixed their seals the day and year hereinbefore written.

[¶ 3.] Prior to the execution of the antenuptial agreement, Clarence and Alice consulted with Clarence's attorney. Alice also sought advice of counsel on her own regarding her interest in the antenuptial agreement. The parties are now disputing whether the antenuptial agreement applies in the event of a divorce between Alice and Clarence. While Alice and her attorney claim the applicability of the agreement to divorce proceedings was

never discussed, Clarence and his attorney maintain otherwise.[1]

[¶ 4.] Approximately ten years later, on November 17, 1995, Clarence filed for a divorce. He claimed irreconcilable differences developed between the parties, or, in the alternative, Alice engaged in conduct constituting extreme mental cruelty. Alice answered the complaint by denying Clarence's accusations. She also filed a counterclaim, asserting that Clarence persisted in conduct amounting to extreme cruelty, and that the parties had no agreement regarding the division of assets between them in the event of a divorce. Clarence replied, arguing Alice's counterclaim failed to state a cause of action upon which relief may be granted. On May 24, 1996, Clarence filed a motion for summary judgment on Alice's counterclaim based upon the antenuptial agreement entered into between Clarence and Alice.

[¶ 5.] The trial court found that the antenuptial agreement is "ambiguous in the event of the parties' divorce, however, applying the rules of construction to the Agreement, the parties hereto intended the Agreement dated June 10, 1985, to be effective and controlling upon the parties in the event of divorce." Concluding that the agreement is valid, the trial court denied Alice's claim for division of property.

[¶ 6.] Alice appeals the trial court's denial of her claim, raising the following issues:

I. Whether an antenuptial agreement that does not specifically address the issue of divorce is controlling in a divorce cause of action.

II. Whether an antenuptial agreement that does not fully disclose the nature and extent of the parties' assets is controlling.

## STANDARD OF REVIEW

[¶ 7.] Although a summary judgment motion was filed by Clarence, the trial court reviewed the file, received testimony by the parties, heard arguments by counsel at a motion hearing, and denied Alice's counterclaim. In doing so, the court issued findings of fact and conclusions of law. " 'Since sum-

mary judgment presupposes there is no genuine issue of fact, findings of fact and conclusions of law are unnecessary.' " *Continental Grain Co. v. Heritage Bank,* 1996 SD 61, ¶ 15, 548 N.W.2d 507, 511 (quoting *Piner v. Jensen,* 519 N.W.2d 337, 339 (S.D.1994) (quoting *Wilson v. Great N. R.R. Co.,* 83 S.D. 207, 211, 157 N.W.2d 19, 21 (1968))). Having made factual determinations as well as legal conclusions based on evidence from both parties, the trial court's findings of fact are reviewed under a clearly erroneous standard, and its conclusions of law are reviewed de novo. *City of Colton v. Schwebach,* 1997 SD 4, ¶ 8, 557 N.W.2d 769, 771.

## DECISION

[¶ 8.] **I. Applicability of the Antenuptial Agreement.**

[¶ 9.] Alice argues that the antenuptial agreement contains no reference regarding the distribution of property in the event of a divorce, separation, or termination of the marriage by any other legal proceedings. Rather, the focus of the agreement is on the distribution of property upon the death of one of the parties. Clarence responds by noting that the trial court found the agreement to be ambiguous and thus applied the rules of contract construction, whereby the intent of the parties is interpreted.

[¶ 10.] The antenuptial agreement provides that "it is desired by the parties that their marriage shall not in any way change their legal right or that of their children and heirs in the property of each of them." Further, it contains various provisions regarding the treatment of property upon one party's death. However, there is no provision in the agreement in which the words divorce, alimony, or property settlement are mentioned.

[¶ 11.] Alice claims that there was no intention that the agreement provide for the circumstance of divorce. Alice's attorney stated that the agreement dealt only with death in view of the fact there was no mention in the proposal that it apply in the event of a divorce. Her attorney stated the parties understood the agreement was for inheritance

---

1. The record reflects Clarence did not testify at the motion hearing.

purposes. In fact, the sole suggestion by Alice's lawyer was to include in the agreement a reference to SDCL 30–5A–4, pertaining to the waiver of the elective share upon the death of a spouse. Alice testified that she and Clarence had no discussion concerning the effect of a divorce and she never thought of such an occurrence. On the other hand, Clarence's attorney testified that, when discussing with Alice and Clarence the antenuptial agreement, he mentioned it covers a divorce situation. Yet, the undisputed fact remains the agreement does not state what would happen in the event of a divorce, notwithstanding the testimony of Clarence's attorney, who drafted the agreement.

[¶ 12.] The trial court found the testimony of Clarence's previous attorney to be "very credible," and incorporated his testimony into its findings of fact. Specifically, the trial court found the agreement is

> ambiguous and based on the testimony the Court determines that [Alice and Clarence] intended the [agreement] to be effective and controlling in the event of a divorce and which intention is manifested by the actions of [Alice and Clarence] prior to the marriage and during the marriage in maintaining separate assets....

[¶ 13.] However, settled law elsewhere clearly indicates "an agreement that did not contain any reference to divorce, and recited that it only affected the parties' rights during marriage or upon death, could not be employed by a divorce court as if it were the property settlement in the dissolution proceedings." 3 Alexander Lindey and Louis I. Parley, *Lindey on Separation Agreements and Antenuptial Contracts* § 90.14, at 90–141 (1996). A holding on this issue is found in *Parkhurst v. Gibson*, 133 N.H. 57, 573 A.2d 454, 458 (N.H.1990), wherein the New Hampshire Supreme Court dealt with an antenuptial agreement which did not specifi-

cally mention divorce, alimony, or property settlement, and concluded it was therefore inapplicable to divorce proceedings.[2] The agreement merely referred to inheritance rights and intervivos transfers of assets. *Id.* While the husband claimed the agreement was intended to maintain separate property forever, the wife argued the agreement was made in anticipation of death only. *Id.* at 456. Although the agreement contained the phrase, "all other marital rights," the court noted the language was general and unambiguous, and held that a "preliminary clause should not ordinarily take precedence over specific provisions of a contract." *Id.* at 458; *see also Foster v. Foster*, 609 A.2d 1171, 1172 (Me.1992) (holding broad "whereas" clauses do not expand the settlement provision to include divorce when it is not otherwise mentioned). Furthermore, the court stated the "'dominant purpose' of the antenuptial agreement is clearly to protect the inheritance rights of the parties' respective children." *Parkhurst*, 573 A.2d at 458.

[¶ 14.] Likewise, in *Levy v. Levy*, the Wisconsin Supreme Court determined that an antenuptial agreement which failed to mention divorce was not to be considered when making a property division pursuant to divorce proceedings. 130 Wis.2d 523, 388 N.W.2d 170, 176 (1986). The agreement addressed the death of either spouse, but not divorce or dissolution of the marriage. *Id.*, 388 N.W.2d at 172. First, it was noted that courts are not to redraft a contract. *Id.* at 174–75. Then the court determined the intent of the parties. *Id.* In doing so, the recital or "whereas" clause (mentioning only death), the testimony of the parties (both parties admitting divorce was not contemplated), and the absence of words such as divorce or separation were all examined. *Id.* The court ultimately held the "premarital

---

**2.** The court stated,

> The five paragraphs setting forth the parties' agreements are particular and specific, and concern only inheritance rights and inter vivos transfers of assets. The words "divorce," "alimony," and "property settlement" do not appear in these provisions, nor anywhere else in the agreement. Immediately following the specific provisions, the agreement states: "This agreement shall be construed to come

within [certain statutory provisions]." The sections referred to govern the inheritance rights of surviving spouses. [The chapter] concerning annulment, separation, and divorce, is not referenced in the agreement.

*Id.* Likewise, there is a statutory reference in the agreement in this case to SDCL 30–5A–4, pertaining to elective share waivers, but there is no statutory reference regarding divorce.

agreement was intended to apply at death only and not at divorce." *Id.* at 176.

Similarly, in *Devault v. Devault,* the court held an antenuptial agreement without reference to divorce may not be applied in divorce proceedings, noting that a court refuses to make a contract for a party. 80 Ohio App.3d 341, 609 N.E.2d 214, 216 (1992). Specifically, the court stated:

> It is this court's conclusion that the antenuptial agreement, by its terms, clearly specifies and therefore limits the rights appellant gave up by signing the agreement. The agreement included provisions concerning the disposition or devolution of property and payments for sustenance upon the death of one or the other of the spouses. In substance, the agreement stated nothing about what would happen upon separation or divorce. The agreement makes provision for release of marital rights only upon death. Whether by intention or oversight, the agreement of the parties does not specifically call for its application to a divorce proceeding. Therefore, the agreement does not apply to the divorce proceedings at bar.

*Id.,* 609 N.E.2d at 215.

[¶ 15.] This Court addressed whether an antenuptial agreement applied to a divorce action in *Ryken v. Ryken,* 440 N.W.2d 300, 304 (S.D.1989). The trial court held the agreement was inapplicable to divorce proceedings because it failed to mention divorce. This Court reversed the trial court's decision, stating, since the antenuptial agreement provided for applicability during legal proceedings, and divorce actions are legal proceedings, the provision was sufficient to indicate its applicability in a divorce action. *Id.* There was no determination as to whether the agreement was ambiguous.

[¶ 16.] Since the trial court in this case found that the prenuptial agreement is ambiguous, we first examine the language of the agreement. As stated in *Ford v. Moore,* "Whether contract language is ambiguous is ordinarily a question of law." 1996 SD 112, ¶ 10, 552 N.W.2d 850, 854–55. Further,

> "A contract is not rendered ambiguous simply because the parties do not agree on

its proper construction or their intent upon executing the contract." 17A AmJur2d *Contracts* § 338 (1991). *Accord Johnson v. Johnson,* 291 N.W.2d 776, 778–79 (S.D. 1980). Rather, a contract is ambiguous only when "it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement...." 17A AmJur2d § 338. *See also City of Sioux Falls v. Henry Carlson Co., Inc.,* 258 N.W.2d 676, 679 (S.D.1977).

*Ducheneaux v. Miller,* 488 N.W.2d 902, 909 (S.D.1992). We therefore determine whether the language contained in the agreement is "capable of more than one meaning[.]" *Id.*

[¶ 17.] A review of the four corners of the document reveals the prenuptial agreement between Alice and Clarence fails to mention divorce or separation in any manner. Rather, the language clearly refers to the inheritance rights of one party upon the other party's death. We first note that there is a presumption that a written agreement proclaims the ultimate intention of the parties. *Carr v. Benike, Inc.,* 365 N.W.2d 4, 6 (S.D.1985) (citations omitted). There are, however, general statements concerning the desire to have their children's rights to their property unaffected by their marriage, but there is no specific statement as to the effect of a divorce or separation or the like. There is also no general reference to "legal proceedings" as in *Ryken,* 440 N.W.2d at 304. As stated previously, such broad provisions stating the parties' desire to have their property separate do not automatically encompass divorce, especially when there are specific clauses in the agreement which all fail to mention divorce. *See, e.g., Foster,* 609 A.2d at 1172; *Parkhurst,* 573 A.2d at 458. Furthermore, similar to the situation in *Parkhurst,* the dominant purpose of the agreement between Alice and Clarence is "clearly to protect the inheritance rights of the parties' respective children." *Id.*

[¶ 18.] We conclude that the antenuptial agreement in this case is unambiguous as a matter of law as it clearly applies to the distribution of property upon the death of one of the parties. Moreover, this Court

cannot and will not rewrite the parties' agreement to include divorce. *See Pengra v. Pengra,* 429 N.W.2d 754, 756 (S.D.1988); *Devault,* 609 N.E.2d at 216; *Levy,* 388 N.W.2d at 174–75. As we stated in *Moller v. Moller,* "we will not put trial courts in the position of relieving parties of an initial bad bargain[.]" 356 N.W.2d 909, 911–12 (S.D.1984). This is especially true when both parties were represented by counsel during the execution process. *Pengra,* 429 N.W.2d at 756–57. As stated previously, both Alice and Clarence consulted attorneys prior to executing the antenuptial agreement. If in fact divorce was to be covered by this agreement, it certainly would not have been too onerous of a task for a lawyer to insert provisions concerning divorce, alimony, or property settlement into the agreement.[3]

[¶ 19.] Thus, we reverse and remand for a determination of property distribution and support issues consistent with this opinion.

[¶ 20.] Since this issue is dispositive, we need not address Issue II.

[¶ 21.] SABERS and KONENKAMP, JJ., concur.

[¶ 22.] MILLER, C.J., and GILBERTSON, J., dissent.

MILLER, Chief Justice (dissenting).

[¶ 23.] I respectfully dissent.

## Standard of Review

[¶ 24.] First, I must point out that the standard of review set forth in the majority writing is not totally accurate and is possibly confusing. I can find no other situation where this or any other court has said that the appropriate standard of review in summary judgment actions is a clearly erroneous review of the facts. This confusion was probably caused by the unusual and unprecedented procedure followed by the trial court.

[¶ 25.] It is clear that the trial court, for some unexplained reason, conducted an evidentiary proceeding, complete with testimony by the parties and exhibits, under the auspices of considering a summary judgment motion, and then entered findings of fact and conclusions of law and summary judgment for Clarence. This was improper. Even the majority fails to note our well-settled principle that findings of fact are, at best, superfluous in a summary judgment. *Koeniguer v. Eckrich,* 422 N.W.2d 600, 601 (S.D.1988); *Wilson v. Great N. Ry. Co.,* 83 S.D. 207, 211, 157 N.W.2d 19, 21 (S.D.1968). *See also* SDCL 15–6–52(a). Therefore, I suggest that the majority writing serves only to compound the trial court's error.

[¶ 26.] Though seemingly a technicality, the distinction between a judgment and a summary judgment is critical to proper appellate review. Our review of a summary judgment motion differs significantly from our review of factual findings and conclusions of law which stem from a judgment. *Com-*

---

**3.** The testimony of the attorney who drafted the agreement reads as follows:

> When I was—when I was explaining to [Clarence and Alice] what an antenuptial agreement is and what it deals with, I explained to them that it also applies to divorce. And the reason I recall that is right after I mentioned that it would apply to divorce as well beyond, after either one of them is gone, is Clarence, I recall, told me that he did not believe in divorce. And he went on to say why he didn't believe in divorce. It wasn't a Christian thing to do and so forth. Alice was there and she agreed with—with Clarence that she didn't believe in divorce either. And—and so it was discussed and that sticks in my mind, that we did discuss it.

> After Clarence got done saying that he didn't believe in divorce and Alice agreed with that, I then mentioned again to them that, like you were talking about earlier, people don't like to hear that word when you—when you are preparing a prenuptial agreement. I did mention to them that this, whether you like it or not, is part of the agreement. This is why you have an antenuptial agreement, not only after death but while you're married in case there is a separation or divorce.

Despite this discussion, it is obvious the agreement did not apply to divorce. Furthermore, as stated in *Mash v. Cutler,* "the [parties] cannot seek to introduce elements of the previous agreement between the parties which are inconsistent with the later memorialized agreement." 488 N.W.2d 642, 650 (S.D.1992). In *Mash,* this Court also cited SDCL 53–8–5, which states the execution of a written contract supersedes previous oral negotiations concerning the content of the contract. *Id.* Therefore, Clarence cannot claim that the agreement applied to divorce under these circumstances.

pare *Grand State Property, Inc. v. Woods, Fuller Shultz & Smith,* 1996 SD 139, ¶10, 556 N.W.2d 84, 87 (stating "[o]ur task [in reviewing a summary judgment] is to determine whether a genuine issue of material fact exists and whether the law was correctly applied.") *and City of Colton v. Schwebach,* 1997 SD 4, ¶8, 557 N.W.2d 769, 771 (noting in reviewing a trial court's judgment, findings of fact are reviewed under a clearly erroneous standard and conclusions of law are reviewed de novo). The fact that the trial court entered unnecessary findings of fact and conclusions of law and titled its order a judgment[4] on a summary judgment motion does not entitle the ruling to a deferential standard of review on appeal. *See Piner v. Jensen,* 519 N.W.2d 337, 339 (S.D. 1994); *Time Out, Inc. v. Karras,* 392 N.W.2d 434, 436 (S.D.1986).

[¶27.] It is clear that the trial court put the proverbial cart before the horse by taking evidence on the ultimate issue of ambiguity at the summary judgment hearing. This procedural irregularity should not be condoned and the case should otherwise be remanded. However, remand in this case would arguably serve only to reproduce the record already before us on appeal. An economical use of judicial resources dictates that we review the trial court's judgment at this juncture as if procedurally correct to avoid duplication and an unnecessary appeal.

### Merits

[¶28.] I specifically dissent from the majority's conclusion that the agreement is unambiguous as a matter of law. The majority disregards findings of the trial court and places its own spin on the language of the agreement, without regard for the plain language of the agreement and the evidentiary basis for the trial court's ruling.

[¶29.] Whether a contract is ambiguous is a question of law which we review de novo. *Ducheneaux v. Miller,* 488 N.W.2d 902, 909 (S.D.1992). A contract is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person in the context of the entire agree-

ment. *Id.* (citing 17A AmJur2d § 338 (1991)). The majority concludes the prenuptial agreement is unambiguous because the agreement "clearly applies to the distribution of property upon the death of one of the parties." I strongly disagree.

[¶30.] I am of the opinion that property distribution upon death is not the sole concern of the agreement. The plain language of the agreement shows it also contemplates preservation of existing property rights, future mortgages, medical expenses and insurance, and the residences of the parties. It specifically states that the marriage "shall not in any way change their legal right" in their respective property, and that "all property" "shall be and forever remain the personal estate of said party...." Additionally, the agreement specifically states "each party shall have at all times the full right and authority, in all respects the same as each would have if not married, to use, enjoy, manage, convey, and encumber such property as may belong to him or her."

[¶31.] The foregoing provisions surely do not exclusively relate to "distribution of property upon death." I assert that the language, taken together with the instrument as a whole, indicates the parties' intention that the agreement apply to situations other than death in which property ownership might be at issue. Whether divorce proceedings are such a situation is arguably unclear from the plain language of the agreement. The agreement is therefore ambiguous as a matter of law.

[¶32.] When a contract is ambiguous, evidence may be introduced to determine the intention of the parties. *Ford v. Moore,* 1996 SD 112, ¶10, 552 N.W.2d 850, 855. The intention of the parties is a question of fact for the fact finder. *North River Ins. Co. v. Golden Rule Const., Inc.,* 296 N.W.2d 910, 912 (S.D.1980). The trial court found that "[Clarence and Alice] intended the Antenuptial Agreement dated June 10, 1985, to be controlling in the event of divorce and [they] intended that neither [Clarence or Alice]

---

4. The trial court's order is titled "JUDGMENT DENYING DEFENDANT'S CLAIM FOR DIVI-   SION OF PROPERTY."

would receive any property from the other in the event of a divorce." The trial court further found that the parties' actions prior to and during the marriage manifested their intention that the agreement controlled in the event of a divorce. We give due regard to the trial court's opportunity to observe the witnesses and the evidence first hand and will overturn its findings of fact only if clearly erroneous. *In re Estate of Elliott,* 537 N.W.2d 660, 662 (S.D.1995). The trial court's findings have not been shown to be clearly erroneous. I therefore dissent, specifically from the majority's paragraph 11, *et seq.* which ignores and, in essence, overrules the trial court's specific evidentiary findings, without giving the "clearly erroneous" deference mandated by law.

[¶ 33.] Although disavowing the procedure followed by the trial court, I would affirm its ultimate holding.

[¶ 34.] I am authorized to state that Justice GILBERTSON joins in this dissent.