2001 SD 134

**The ICEHOUSE, INC., Plaintiff and Appellant,**

v.

**Paul GEISSLER and PTG Enterprises, LLC, Defendants and Appellees.**

No. 21768.

Supreme Court of South Dakota.

Considered on Briefs Aug. 28, 2001.

Decided Nov. 7, 2001.

John K. Nooney, Penny Tibke Platnick, Ryan J. Taylor of Morrill, Thomas, Nooney & Braun, LLP, Rapid City, for plaintiff and appellant.

Mark J. Connot of Gunderson, Palmer, Goodsell & Nelson, Rapid City, for defendants and appellees.

GILBERTSON, Chief Justice.

[¶ 1.] The Icehouse, Inc. ("Icehouse") leased portions of a building owned by Paul Geissler and PTG Enterprises, LLC (collectively referred to as "Geissler"). The applicable leases extended through March 5, 2001, with an option to renew for another five-year term held by Icehouse. After a dispute arose as to the parties' rights under the leases, Icehouse filed a declaratory judgment action. Geissler filed a counterclaim, alleging numerous material breaches of the leases, and requesting immediate eviction. The circuit court concluded one lease was ambiguous and ordered Icehouse to vacate the premises at the expiration of the lease. We reverse and remand as to the issues raised by Icehouse and affirm as to the issues raised by Geissler upon a notice of review.

## FACTS AND PROCEDURE

[¶ 2.] On March 6, 1996, Icehouse executed a lease agreement, referred to as the Warehouse lease, with North Central Supply, Inc. ("North Central"), for portions of a building in Rapid City known as the Manor House Building ("Manor House"). The lease provided for an initial five-year term, and provided Icehouse the option to renew the lease for an additional five-year term. Three specific portions of the Manor House were leased to Icehouse: a cool-

er-freezer area, a warehouse bay, and a small office. These areas are not contiguous, but are connected by a common area used by other tenants of the Manor House. Along the common area are a number of loading bays, which are available for use by the tenants of Manor House. Under the terms of the lease, Icehouse was responsible for the purchase and installation of the freezers and coolers. Ownership of the freezers and coolers vests in the Lessor when the lease expires.

[¶ 3.] Icehouse executed another lease with North Central on June 7, 1996, referred to as the Office lease. This lease applied to additional office space in the Manor House. Like the Warehouse lease, the Office lease expired on March 5, 2001, with an option to renew for another five years. The new office space was connected to the warehouse bay and cooler-freezer area by the common area described earlier. Icehouse used these leased areas to operate an ice manufacturing business.

[¶ 4.] North Central sold Manor House to George Taylor on October 4, 1996. In November of 1998, Icehouse and Taylor entered into an oral lease, whereby Icehouse agreed to lease an additional warehouse bay for $1,000 per month. A written agreement for this lease was prepared but never executed by either party. This document is referred to as the "unexecuted lease." In early 1999, Taylor became interested in selling Manor House. Prior to the sale, Icehouse signed an "Estoppel Certificate." The purpose of this certificate was to inform potential buyers of the rights and obligations held by the owner of Manor House. The certificate provided that Icehouse held the property "under three (3) written lease agreements dated March 6, 1996, June 7, 1996, and November 1, 1998, respectively." Taylor eventually sold the property to Geissler on April 19, 1999.

[¶ 5.] Approximately one year later, in April of 2000, Geissler requested that Icehouse purchase the Manor House. Icehouse eventually declined to purchase the building on Geissler's terms. Until that point, Icehouse had paid, and Geissler had accepted, the $1,000 monthly payments pursuant to the oral lease. However, in May 2000, Geissler notified Icehouse he would be raising the rent to $4,000 per month. Rather than pay the increased rent amount, Icehouse vacated the warehouse bay covered by the oral lease. At the same time, Geissler began alleging various breaches of the Warehouse Lease, including unauthorized use of common areas, failure to pay for utilities, unauthorized freezer storage for third parties, contamination of the soil, and failure to remove a junk truck upon timely notice. Geissler also claimed Icehouse was bound by the "hold-over tenant" penalty provisions in the unexecuted lease.

[¶ 6.] On June 12, 2000, Icehouse filed a complaint for declaratory relief, requesting an adjudication of the rights of the parties under the leases. Geissler filed a counterclaim, seeking the holdover tenant penalty and immediate eviction for material breaches of the leases. The parties proceeded to a bench trial on October 12, 2000. The trial court concluded that Geissler was not entitled to the holdover penalty because the unexecuted lease was not binding on the parties. It also concluded that assuming Icehouse's actions were breaches of the leases, none of the alleged breaches were material to the leases, and therefore Geissler was not entitled to rescission and immediate eviction. Finally, the trial court concluded that certain provisions in the Warehouse lease were ambiguous. Because the lease did not contain a severability clause, the trial court felt compelled to cancel the entire lease, thereby precluding Icehouse from exercis-

ing its option to renew. As a result, Icehouse was ordered to vacate the premises on March 5, 2001, when the leases expired.[1] Icehouse appeals from the court's order, raising the following issues:

1. Whether the Warehouse lease is ambiguous.
2. Whether the existence of an ambiguity in a lease precludes the renewal of the lease.
3. Whether the absence of a severability clause requires the termination of the entire lease when particular provisions are unenforceable.

By notice of review, Geissler raises the following additional issues:

4. Whether Icehouse materially breached the leases, justifying rescission and immediate eviction;
5. Whether the terms of the unexecuted lease are enforceable;
6. Whether Geissler overcharged Icehouse for water usage;
7. Whether Geissler was entitled to attorney's fees, costs, and expenses under the lease agreements.

## STANDARD OF REVIEW

■■■ [¶ 7.] A trial court's findings of fact are reviewed by this Court under the clearly erroneous standard. *Arnold Murray Constr., LLC v. Hicks*, 2001 SD 7, ¶ 6, 621 N.W.2d 171, 174. Pursuant to this standard, we will reverse a finding of fact only "if we are left with a definite and firm conviction that a mistake has been made." *Id.* "On appeal, this Court can read a contract itself without any presumption in favor of the trial court's determination." *Thunderstik Lodge, Inc. v. Reuer*, 1998 SD 110, ¶ 12, 585 N.W.2d 819, 822 (additional citations omitted). For that reason, the interpretation of contractual provisions is a question of law, which we review de novo.

*Mahan v. Avera St. Luke's*, 2001 SD 9, ¶ 15, 621 N.W.2d 150, 154. Whether a contractual provision is ambiguous is likewise a question of law, reviewed de novo. *St. Paul Fire and Marine Ins. Co. v. Schilling*, 520 N.W.2d 884, 886 (S.D.1994) (citations omitted).

## ANALYSIS AND DECISION

### [¶ 8.] 1. Whether the Warehouse lease is ambiguous.

■■■ [¶ 9.] In this action, Icehouse requested a declaration of the parties' rights under the leases, specifically as to Icehouse's right to use the common area. The trial court concluded that the Warehouse lease was ambiguous as to the parties' rights because the lease did not mention the common area. The relevant portion of the lease is section XXVIII, which provides in part:

> Vehicle parking will be regulated by a policy that will apply to all tenants and will be developed at a later date. Under such policy, [Icehouse] will be granted exclusive access to the west most door of the south wall to which it is entitled to exclusive possession *and reasonable access to docks that it is granted non-exclusive possession of.* (emphasis added).

The "west most door" mentioned above lies within the warehouse bay specifically leased by Icehouse under the Warehouse lease. All other docks located in Manor House lie within the "common area." It is clear from the language quoted above that Icehouse is entitled to "reasonable access" to those areas. While the word "reasonable" is not defined in the lease, that term alone does not render the provision ambiguous.

1. The trial court's order was stayed pending the outcome of this appeal.

[¶ 10.] The trial court also noted section X when making its decision that the lease was ambiguous. That provision provides:

> Lessor shall pay for all utilities for the non cooler-freezer warehouse and office areas. *Lessor shall install at its expense and [Icehouse] shall pay for all water usage metered through said separate water line to its leased premises.*
>
> [Icehouse] shall pay for all of the utility expense for utilities, including electricity and water for the cooler-freezer areas. Separate meters for the electrical usage in the cooler-freezer area shall be utilized to calculate [Icehouse's] monthly electrical usage for said cooler-freezer area, which meters shall be read by Lessor and Lessor shall bill [Icehouse] monthly for such electrical usage for that area and [Icehouse] shall pay said bill within ten (10) days after being billed by Lessor.
>
> [Icehouse] shall also be responsible for the cost of installation of a new electrical service to [Icehouse's] leased premises and shall pay all electrical billings for this service directly which new electrical services shall be metered separately. (emphasis added).

At the time of the hearing, no separate metered water line had been installed. Hence, Icehouse was under no obligation to pay for the water used to produce its ice.

[¶ 11.] Pursuant to this provision, Icehouse was responsible for only the electricity used in the cooler-freezer areas. Geissler is responsible "for all utilities for the non cooler-freezer warehouse and office areas." Despite these explicit statements, the trial court concluded that provision was ambiguous.

[¶ 12.] During the peak ice-producing season, Icehouse typically employed portable icemakers and freezers in addition to those in the freezer-cooler area. These icemakers and freezers are positioned in, and use electricity from, the warehouse area. Under the clear terms of the lease, Icehouse is not responsible for electricity used in the warehouse area. Geissler argued, and the trial court concluded, that the lease was ambiguous because Icehouse was not responsible for the electricity used in the production of that ice. We fail to see how that argument creates ambiguity. Geissler is responsible "for all utilities for the non cooler-freezer warehouse and office areas." When viewed objectively, this phrase can have only one meaning and therefore, no ambiguity exists. *See Pesicka v. Pesicka*, 2000 SD 137, ¶ 10, 618 N.W.2d 725, 727. The trial court erred in deciding otherwise.

[¶ 13.] When a contract is unambiguous and clear, we determine the parties' intent from the four corners of the document and extrinsic evidence is not needed.[2] *In re Estate of Klauzer*, 2000 SD 7, ¶ 14, 604 N.W.2d 474, 478. After declaring the lease provisions ambiguous, the trial court then apportioned the parties' responsibility for electricity and water. In its conclusions of law, the trial court stated "that certain electricity utilized for purposes of production equipment, although located outside the cooler-freezer warehouse area is the responsibility of the Icehouse, while other electricity which is merely incidental to the use and occupancy of the premises by the Icehouse is the responsibility of the Lessor." While this disposition may seem equitable and fair, it directly contradicts the terms of the lease, which provide that Geissler "shall pay for all utilities for the non cooler-freezer warehouse and office

2. Therefore, the evidence heard by the trial court as to custom and course of performance under the contract is not relevant to our determination.

areas." There is no distinction made in the Warehouse lease between electricity used for production and electricity "incidentally" used. If the parties had intended to make that distinction, they could have done so. In fact, they did just that in the Office lease. Under that lease, the parties agreed that "Lessor shall be responsible for all general utility expenses consumed upon the premises .... Utility consumption which provides 'value added' to the tenant's products shall be considered manufacturing utility costs and such costs shall be the sole responsibility of the tenant." The parties clearly knew how to differentiate between manufacturing and general costs. However, that difference was not incorporated into the Warehouse lease and a court cannot import language into a contract which the parties did not intend. *Id.* The lease language clearly specifies that Geissler is responsible for all electricity used on the lease premises except the cooler-freezer area. The trial court erred in directing otherwise.

[¶ 14.] The trial court also concluded "that the water utilized by the Icehouse is for purposes of production and is the responsibility of the Icehouse." This conclusion also clearly contradicts the language of the lease. At the time the Warehouse lease was signed, Icehouse agreed to pay for the water used in the cooler-freezer area, on the condition that the Lessor installed a separate metered water line. That has not been done. If Geissler installs a separate metered water line, Icehouse will then be responsible for the water it uses. Until that time, however, water expense remains Geissler's responsibility.

[¶ 15.] Again, it may seem equitable and fair to apportion the parties' responsibilities as the trial court did. However, Icehouse entered into a valid lease agreement with North Central. Pursuant to its obligations under that lease, Icehouse purchased and installed the coolers and freezers. At the expiration of the lease, those coolers and freezers become the property of whoever owns Manor House. The terms of the lease, including the water usage term, were bargained for trade-offs. Geissler assumed North Central's responsibilities when he purchased the Manor House with full knowledge of the accompanying rights and responsibilities. He has failed to fulfill the obligation which would entitle him to receive payment for water usage. We will not relieve Geissler of his obligations simply because it now appears Icehouse received the better bargain. *See Roth v. Roth*, 1997 SD 75, ¶ 18, 565 N.W.2d 782, 787 (citations omitted). In sum, we reverse the trial court's conclusion that the lease was ambiguous and reverse its allocation of responsibility under the leases to reflect the clear language of the lease as stated herein.

[¶ 16.] **2. Whether the existence of an ambiguity in a lease precludes the renewal of the lease.**

[¶ 17.] After determining the Warehouse lease was ambiguous, the trial court concluded that an ambiguous lease could not be renewed. Because we deem the lease to be unambiguous, this issue becomes moot. Hence, there is no reason why Icehouse cannot exercise its option to renew. The Warehouse lease provides:

Provided [Icehouse] is not in default of this lease agreement, [Icehouse] shall have the option to renew said lease for one additional term of five (5) years, providing that it shall notify Lessor in writing, at least ninety (90) days before the expiration of the lease term of its intention to exercise said option.

Pursuant to this clear language, Icehouse has the option to renew the lease, if proper notice is given and if it is not in default.

At trial, the president of Icehouse testified that he intended to exercise the option to renew. Icehouse states in its brief that it gave proper notice of its intent to renew and Geissler has not objected to this claim in his brief.

[¶ 18.] **3. Whether the absence of a severability clause requires the termination of the entire lease when particular provisions are unenforceable.**

[¶ 19.] The trial court concluded that certain provisions of the Warehouse lease were ambiguous and therefore unenforceable. As the lease contained no severability clause, the trial court concluded it was forced to cancel the entire lease. Because we reverse the trial court's conclusions as to ambiguity and enforceability, we need not decide whether the trial court's cancellation of the lease was warranted.

[¶ 20.] **4. Whether Icehouse materially breached the leases, justifying rescission and immediate eviction.**

[¶ 21.] Rescission of a lease "is an equitable remedy, which should only be granted in extraordinary circumstances." *Sejnoha v. City of Yankton*, 2001 SD 22, ¶ 11, 622 N.W.2d 735, 739 (citing *Mattson v. Rachetto*, 1999 SD 51, ¶ 17, 591 N.W.2d 814, 818). In *Thunderstik Lodge*, we noted that:

As a lease is a contract we will follow the law of contract in regard to breach. "[R]escission of a contract is not generally permitted for a casual, technical, or unimportant breach ..., but only for a breach so substantial as to tend to defeat the very object of the contract." This Court has held that a breach must be "substantial" and relate to a "material" aspect of the contract to warrant rescission. A "material breach" would defeat "the very object of the contract."

1998 SD 110 at ¶ 25, 585 N.W.2d at 825 (internal citations omitted). Whether a party's conduct constitutes a material breach of contract is a question of fact. *Moe v. John Deere Co.*, 516 N.W.2d 332, 335 (S.D. 1994) (citations omitted); *Roberts v. Wyman*, 135 Idaho 690, 23 P.3d 152, 159 (2000); *Kaiser v. Market Square Discount Liquors, Inc.*, 992 P.2d 636, 640 (Colo.App. 1999). As such, the trial court's finding that none of the alleged breaches were material will be reversed only if clearly erroneous. *Arnold Murray Constr.*, 2001 SD 7 at ¶ 6, 621 N.W.2d at 174. We find no such clear error.

[¶ 22.] Geissler alleges Icehouse violated the Warehouse lease by:

failing to remove a junk truck after being given notice, failing to pay for water used by the Icehouse, storage of oil drums and resultant contamination from spillage of oil, usage of the ramp area for loading and unloading that was located outside the areas leased by the Icehouse, usage of Manor House electricity for the production of ice, and subletting cooler and freezer warehouse areas of the Manor House without prior written approval.

We have already determined that, as to the issues of usage of water and electricity, Icehouse had complied with the lease provisions. As for the ramp areas, Icehouse was entitled to reasonable access. Geissler has failed to establish the trial court was clearly erroneous in finding Icehouse's use of the ramp areas was so unreasonable as to constitute a material breach. Additionally, Icehouse did not sublet the cooler-freezer space, it merely stored frozen meat for various customers. Subletting involves the transfer of legal right of occupancy, which has not occurred. The matters of the junk truck and oil drum storage, if breaches at all, do not "defeat the very object of the contract" and are therefore not material. *Thunderstik Lodge*, 1998

SD 110 at ¶ 25, 585 N.W.2d at 825. Geissler has failed to show clear error by the trial court.

**[¶ 23.] 5. Whether the terms of the unexecuted lease are enforceable.**

[¶ 24.] The trial court concluded that the unexecuted lease was not enforceable, therefore, Icehouse was not subject to the holdover tenant provision contained therein. There is no dispute that Icehouse did not sign the unexecuted lease. However, Geissler argues the unexecuted lease is enforceable because of the Estoppel Certificate signed by Icehouse. That certificate was prepared by George Taylor to facilitate the sale of Manor House and stated that Icehouse "holds the premises under three (3) written lease agreements dated March 6, 1996, June 7, 1996, and November 1, 1998 respectively." Geissler argues this statement gives effect to all the provisions of the unexecuted lease, including the provision that doubles the rent for periods beyond the term provided in the document, October 31, 1999.

[¶ 25.] In its findings of fact, the trial court noted "[t]hat the Oral Lease was never reduced to writing or memorialized by any written document purporting to contain terms and conditions in addition to those of the Oral Lease and that the parties never assented to the terms and conditions of any such purported written document." We review this finding only for clear error. *Arnold Murray Constr.*, 2001 SD 7 at ¶ 6, 621 N.W.2d at 174. Bob Smith, president of Icehouse, testified that he had orally agreed to pay $1,000 per month to rent the second warehouse bay. Pursuant to the oral agreement, Icehouse paid, and the owner accepted, that sum each month. Bob Smith also testified that he had never seen the unexecuted lease before the present litigation. Besides the oral agreement to pay $1,000 per month for a second warehouse bay, there was no meeting of the minds as to any other terms contained in the unexecuted lease, in particular the hold-over penalty. *See Jacobson v. Gulbransen*, 2001 SD 33, ¶ 22, 623 N.W.2d 84, 90. Even the Estoppel Certificate evidences no provisions other than the property leased and the payment amount. Therefore, we cannot say the trial court was clearly erroneous in finding no meeting of the minds and refusing to enforce the terms of the unexecuted lease.

**[¶ 26.] 6. Whether Geissler overcharged Icehouse for water usage.**

[¶ 27.] The trial court found that Geissler had charged Icehouse $3,505.37 for water used from June 28, 2000 to September 16, 2000, when Geissler had been billed only $2,872.33 by the City during that same period. Geissler argues this finding was clearly erroneous and points to contrary testimony from the Manor House manager. The trial court's finding is supported by invoices from the City office to Geissler, which clearly show that Geissler was overcharging Icehouse for water usage. Therefore, the court's finding is not clearly erroneous.

**[¶ 28.] 7. Whether Geissler was entitled to attorney's fees, costs, and expenses under the lease agreements.**

[¶ 29.] Pursuant to the Warehouse lease, Icehouse agreed to

indemnify and save [Geissler] harmless from all penalties, claims, demands, liabilities, expenses and losses, of whatever nature arising from [Icehouse's] use of the lease premise .... This indemnification shall extend to and include a reasonable attorney fee incurred by [Geissler] for any litigation to which the Lessor is made a party or threatened to be made a party and which arises out of the use and occupation of the lease premises by [Icehouse].

The trial court ruled this provision inapplicable. We agree. These provisions are generally recognized to provide indemnity

when third parties bring an action against the indemnitee, but not, as here, when the dispute is between the two contracting parties. *See Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 21 (2d Cir.1996); *Hooper Assoc., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 549 N.Y.S.2d 365, 548 N.E.2d 903, 905 (1989); *Derr Const. Co. v. City of Houston*, 846 S.W.2d 854, 858 (Tex.App.1992); *Ray D. Baker Contractor, Inc. v. Chris Nelsen & Son, Inc.*, 1 Mich.App. 450, 136 N.W.2d 771, 773 (1965).

[¶ 30.] Judgment is reversed and remanded in part as to the issues raised by Icehouse and affirmed as to the issues raised by Geissler.

[¶ 31.] SABERS, AMUNDSON and KONENKAMP, Justices, concur.

[¶ 32.] MILLER, Retired Chief Justice, was a member of the Court at the time this action was submitted, but was disqualified and did not participate.