HARTZ, Circuit Judge,
dissenting.
I respectfully dissent. I agree with the majority opinion’s analysis and discussion of the FCC’s home run wiring rules. But I disagree with the application of the rules to this case because I read the licensing agreement differently than the majority does.
The majority opinion states that Time Warner (for simplicity I shall refer to both TeleCable and Time Warner as Time Warner) has a license to maintain home run wires to each apartment in The Atriums but that this license is conditional — it exists only so long as the tenant subscribes to Time Warner’s cable service. Before explaining why I think that this is not a proper construction of the terms of the license agreement, I should note that it would be rather surprising if the parties had in fact imposed the condition that the majority opinion reads into the agreement. Without a license, Time Warner would be a trespasser, and hence could be required to remove its home run wires at the whim of The Atriums. The Atriums, however, would have had no legitimate reason to require Time Warner to remove the wires whenever an individual tenant canceled service. To be sure, under the new FCC regulations The Atriums might have a good reason to restrict Time Warner’s license — the restriction would enable The Atriums to require Time Warner to compete with other cable providers for the patronage of the tenants. But no one suggests that the new regulations were foreseeable when the license agreement was executed.
In my view, the majority opinion errs in (1) reading too much into the preamble of the agreement, (2) failing to consider the clear operative language of the agreement, (3) overlooking the parties’ initial construction of the agreement, and (4) misconceiving the “access” provision of the agreement, which merely sets forth the time during which Time Warner can enter The Atriums in connection with its license.
1. The Preamble
Rather than relying on the operative terms of the agreement — the numbered paragraphs following the words “NOW, THEREFORE, the parties hereto agree as follows” — the majority opinion relies on language in the preamble. It focuses on the language in Paragraph C of the preamble stating that “[Time Warner] desires to install, operate and maintain its ... facilities ... in the Project ... in order to serve those tenants ... who shall from, time to time pay [Time Warner] for its services.” (emphasis added). According to the majority opinion, the emphasized language shows that the license for maintaining the home run wire to an apartment is limited to those periods during which the apartment’s tenant is a paid subscriber to Time Warner’s services.
I cannot agree. Although the purpose of the agreement undoubtedly is to provide cable service to the tenants while they are paid subscribers, that purpose does not fully determine the scope of the license. Perhaps that purpose could be adequately served by terminating the license to maintain the home run wire whenever the tenant cancels service. But that purpose could also be properly served by permitting continuation of the license to maintain those wires even when the tenant cancels. Continuation of the license despite cancellation would free Time Warner from the risk that The Atriums would whimsically demand removal of the wires; Time Warner could then be sure that it could promptly resume service (without the need to reinstall the home run wire) if a new *1057 tenant desired cable television. When the agreement was executed, continuation of the license would have served the convenience of Time Warner and tenants while causing no inconvenience or harm to The Atriums.
One must therefore look to the operative provisions of the agreement to determine the scope of the license. Indeed, the preamble to a contract does not define the rights and duties of the parties; it serves only as an aid in interpretation. See Grynberg v. FERC, 71 F.3d 413, 416 (D.C.Cir.1995) (“[I]t is standard contract law that a Whereas clause, while sometimes useful as an aid to interpretation, cannot create any right beyond that arising from the operative terms of the document.” (internal quotation marks omitted)). A leading treatise on contract law approves the statement that “ ‘[t]he generally accepted interpretive rule is that a general, preliminary clause should not ordinarily take precedence over specific provisions of a contract.’ ” 11 Williston on Contracts § 32:15 (4th ed.) (quoting Parkhurst v. Gibson, 133 N.H. 57, 573 A.2d 454, 458 (N.H.1990)); see Rose v. M/V “Gulf Stream Falcon,” 186 F.3d 1345, 1350 (11th Cir.1999) (“under Florida law ... ‘whereas’ or other prefatory clauses are not binding”).
2. Operative Language
The relevant operative provision of the license agreement is the first sentence of Paragraph 1:
Subject to the terms and conditions hereinafter set out, [The Atriums] hereby grants to [Time Warner] the right, license and permission to install, operate and maintain such of the facilities as [Time Warner] deems necessary or desirable in or on [The Atriums’] property and in the Project in order to provide CATV and Pay TV services to tenants in the Project.
(emphasis added). (Although the majority opinion quotes Paragraph 1 when it sets forth most of the agreement, it never addresses this language.) There can be no dispute that Time Warner deems it desirable to keep its home run wire on the premises even after a tenant cancels service. Leaving the wire in place enables Time Warner to provide service to an apartment more readily if the tenant (or a new tenant) decides to resume service.
One could argue that when the agreement was executed Time Warner did not need a license that would prevent The Atriums from ordering removal of the home run wire whenever a tenant discontinued service. Such protection at that time would have seemed unnecessary because The Atriums would surely not have made the purposeless, destructive demand that Time Warner remove the wire. But that argument demonstrates why The Atriums would not have resisted an unconditional license — one that continues even when a tenant terminates service. Accordingly, I would read the agreement to grant a license to maintain the home run wire to an apartment regardless of whether the tenant is a current paid subscriber. In my view, this construction of the agreement is compelled even if the agreement is read strictly against the interests of Time Warner.
To say that the license is “unconditional” is not to say that the “in order to provide [cable] services” clause of Paragraph 1 is meaningless. It has at least two important functions. First, when Time Warner can no longer provide cable service — for example, it might lose its franchise — the license is useless and becomes void, so Time Warner could not reasonably “deem[ ][it] necessary or desirable” to maintain home run wires. Second, and *1058 more importantly, the license is limited to cable service. Time Warner would not be permitted to use the license for, say, telephone service.
3. Initial Construction of Agreement
There is an additional compelling reason not to construe Paragraph 1 as limiting the home-run-wire license to the period when the tenant subscribes to Time Warner service. Such a construction of Paragraph 1 would be contrary to the conduct of the parties at the outset of the agreement’s operation. The home run wiring was installed before there were tenants. Yet the phrase “in order to provide CATV and Pay TV services to tenants in the Project” applies not only to maintenance of the home run wires but also to their initial installation. To quote again the first sentence of Paragraph 1:
Subject to the terms and conditions hereinafter set out, [The Atriums] hereby grants to [Time Warner] the right, license and permission to install, operate and maintain such of the facilities as [Time Warner] deems necessary or desirable in or on [The Atriums’] property and in the Project in order to provide CATV and Pay TV services to tenants in the Project.
(emphasis added). If the “in order to provide” language limits the privilege granted to Time Warner to the period when it is serving a current subscriber, then home run wiring to an apartment could not have been installed until the apartment’s tenant became a subscriber. ' Moreover, it would be remarkable for The Atriums to permit Time Warner to install home run wire to an unoccupied apartment but then deny a license to keep the installed wire in place if the first tenant decided not to subscribe. The parties’ construction of the agreement so close to the time of the agreement’s execution is strongly probative of the parties’ understanding of the agreement at the time of execution. See Heyen v. Hartnett, 235 Kan. 117, 679 P.2d 1152, 1157 (1984).
4. “Access” Provision
I fail to understand the majority opinion’s reliance on the “access” provision in the agreement, the second sentence of Paragraph 1: “[Time Warner] shall have the right to enter the Project at any time to perform maintenance on and make repairs and replacements of the facilities, or any part thereof, and to install or disconnect customers.” Focusing on the words giving Time Warner “the right to enter the Project at any time ... to install or disconnect customers,” the majority opinion contends that this provision would be unnecessary if Time Warner “had a right to enter The Atriums at any time to maintain unused wires.” Op. at 1049.
This argument misconceives the access provision. The provision merely clarifies Time Warner’s right of entry onto The Atriums’ premises to perform work in connection with its license. It is one thing to grant a license to install and maintain wiring, and quite another to set the times when the licensee can enter the premises in connection with the license. The access provision addresses only the latter issue. Without the access provision one might interpret the agreement to allow access onto the premises only at “reasonable” times — such as during regular business hours. Indeed, the following sentence of Paragraph 1 restricts the time during which Time Warner can market its services on the premises: “[Time Warner] shall have the right between the hours of 9:00 AM and 5:00 PM to enter the Project to solicit new customers.”