IN RE the MARRIAGE OF: Mary L. LEVY
(Cahlamer), Petitioner-Appellant-Petitioner,

v.

Donald M. LEVY, Respondent.†

Supreme Court

*No. 84–1425. Argued April 29, 1986.—Decided June 10, 1986.*

(Also reported in 388 N.W.2d 170.)

† Motion for reconsideration pending.

For the petitioner-appellant-petitioner there were briefs by *Burton A. Strnad* and *Burton A. Strnad, S.C.,* Milwaukee, and oral argument by *Mr. Strnad.*

For the respondent there was a brief by *Clifford K. Meldman* and *Meldman & Meldman, S.C.,* Milwaukee, and oral argument by *Clifford K. Meldman.*

HEFFERNAN, CHIEF JUSTICE. This is a review of an unpublished per curiam decision of the court of appeals dated August 15, 1985, affirming a judgment

and orders[1] of the circuit court for Milwaukee county, Patricia S. Curley, circuit judge. The issues before this court are whether the court of appeals was correct in affirming the circuit court's retroactive application of sec. 767.255(11), Stats., and in holding as a matter of law that a premarital agreement intended to apply at death was applicable at divorce as well.

We reverse and remand to the circuit court for consideration of the property division, without reference to the premarital agreement between the parties, solely on statutory provisions regarding property division under sec. 767.255, Stats. We conclude, as a matter of law, that the circuit court's construction of the premarital agreement as being applicable to divorce was in error. This court need not reach the issue of whether the court of appeals was correct in applying sec. 767.255(11) retroactively, because we have determined that this premarital agreement, which contemplated property division at death, had nothing to do with the situation covered by that statute—property division upon divorce.

Mary and Donald Levy were married on May 31, 1974. Mary was twenty-six years old, and Donald was thirty-nine years old. It was Mary's first marriage. Donald had four minor children from a previous marriage. Donald was a physician with a thriving and successful practice prior to his marriage to Mary.

---

[1] The notice of appeal states the appeal is "from the Judgment and the whole thereof made and entered July 5, 1984, and all Orders appended thereto, including, but not limited to, Order dated April 2, 1984, (pp. 4–9 of Judgment), July 10, 1984, and November 8, 1983, (pp. 31–50)."

The day before the wedding, Donald and Mary entered into a prenuptial agreement.[2] Both were represented by attorneys. The agreement provided that Mary was to receive a $50,000 policy on Donald's life and that the home of the parties was to be held in joint tenancy.[3] The agreement contemplates what should

---

[2] The agreement in part provides:

"WHEREAS, it is the intention of both Dr. Levy and Miss Cahlamer that their respective rights in each other's property and estate accruing by law or otherwise, both during the term of such marriage and upon the termination thereof by the death of one or both of the parties hereto, shall be determined and fixed solely and entirely by this Agreement; and

"WHEREAS, it is the intention of both Dr. Levy and Miss Cahlamer to waive, relinquish and bar all their respective dower and curtesy rights or interests and any and all statutory rights or interests of any kind, either as husband or wife, or widower or widow, of the other, in and to any property now owned or hereafter acquired by the other, and whether now so otherwise provided under existing or future laws and statutes of the State of Wisconsin (where both of the parties are now domiciled and where the parties intend to reside after their marriage), or the laws and statutes of any other state, or of any future laws or statutes of any state; . . .
". . .

*"TENTH:* This Agreement represents the entire Agreement and understanding between Dr. Levy and Miss Cahlamer in respect to their property rights and obligations with respect to each other, and this Agreement (including this provision against oral modification or waiver) shall not be modified or waived except in writing duly subscribed and acknowledged by the parties hereto."

[3] *"FOURTH:* Following the marriage of Dr. Levy and Miss Cahlamer, Dr. Levy will transfer to Miss Cahlamer the ownership of $50,000.00 face value of life insurance on his life. It is contemplated by the parties that following such transfer of ownership to Miss Cahlamer, she will change the beneficiary on said policy to herself. . . .
". . .

happen upon the death of either spouse but does not refer to divorce or dissolution of the marriage.

The circuit court found the premarital agreement between the parties was equitable and enforceable. The court construed the agreement to be applicable to a divorce situation and to fall within the provisions of sec. 767.255(11), Stats. The circuit court's award to Mary was based on the terms of the agreement. Mary received a $50,000 life insurance policy, household goods, and a share of the home value in cash.

The court of appeals upheld the circuit court's finding that the prenuptial contract was applicable to termination of the marriage by divorce as well as by death. It also concluded that the circuit court had considered the relevant law and facts in reaching its decision and, therefore, did not abuse its discretion.

We reverse the decision of the court of appeals, which affirmed the circuit court.

■

The construction of a written contract is normally a matter of law for the court. *RTE Corp. v. Maryland Casualty Co.*, 74 Wis. 2d 614, 621, 247 N.W.2d 171 (1976); *Pleasure Time, Inc., v. Kuss*, 78 Wis. 2d 373, 379,

---

"FIFTH: In the event that the parties purchase a residence during the marriage, title will either be placed in their joint names with the right of survivorship, or if title is taken in the name of one of the parties individually, then the party in whose name title is placed will immediately thereafter execute a new last will and testament giving to the other party all of his right, title and interest in said property upon death. The parties further agree that with respect to normal household furnishings and effects, but specifically excluding antiques and objects of art, each party will provide in a last will and testament to be executed as promptly as reasonably possible following the marriage that all of such ordinary household furnishings and effects owned by him shall pass to the other party at death."

254 N.W.2d 463 (1977). The appellate court may determine questions of law independently with no deference to the conclusions reached by the trial court. *American Mutual Liability Insurance Co. v. Fisher*, 58 Wis. 2d 299, 304, 206 N.W.2d 152 (1973); *Pleasure Time v. Kuss, supra*, at 379; *Herwig v. Enerson & Eggen*, 98 Wis. 2d 38, 39, 295 N.W.2d 201 (Ct.App. 1980).

This is particularly true where the evidence is documentary.

> "The meaning of a word in a legal document is a matter within the expertise of the supreme court, and is not dependent upon the fact finder's appraisal of the demeanor of witnesses or the credibility that may be ascribed to their testimony. Accordingly, even were we to disagree with the finding of the trial court, we would be free to reach our own conclusion with respect to the meaning of a word." *American Mutual Liability Insurance Co. v. Fisher*, 58 Wis. 2d at 303–04 (1972).

This court need not defer to the legal conclusions reached by either the circuit court or the court of appeals.

In this case, the circuit court concluded that the premarital agreement between the parties, which addressed property division upon dissolution of the marriage by death, was equally applicable upon dissolution by divorce. The court relied on the language of sec. 767.255(11), Stats., for its finding that "the failure to specifically mention divorce in the antenuptial agreement is not fatal to the court's accepting the agreement." Section 767.255(11) provides as follows:

> "Any written agreement made by the parties before or during the marriage concerning any arrangement for property distribution; such agree-

ments shall be binding upon the court except that no such agreement shall be binding where the terms of the agreement are inequitable as to either party. The court shall presume any such agreement to be equitable as to both parties."

The court emphasized the language of the statute referring to "*any* written agreement" and "*any* arrangement for property distribution" to support its conclusion that the legislature did not intend to limit the agreements to those specifically stating or contemplating divorce and separation. The trial court read more into this section than is there and read it out of context as well. As a general rule, each part of a statute should be construed in connection with every other part so as to produce a harmonious whole. *Pelican Amusement Co., Inc. v. Town of Pelican,* 13 Wis. 2d 585, 593, 109 N.W.2d 82 (1961). The introductory paragraph of sec. 767.255 specifically provides that:

"Upon every judgment of annulment, divorce or legal separation, or in rendering a judgment in an action under s. 767.02(1)(h) [actions affecting the family—property division], the court shall divide the property of the parties and divest and transfer the title of any such property accordingly."

There is no language in sec. 767.255, Stats., which refers to death; the legislature clearly intended that it apply only to property division at divorce. The circuit judge erred in interpreting sec. 767.255(11) to provide that "any written agreement" as used therein could refer to an agreement which on its face was intended to take effect at death. As the introductory paragraph

clearly recites, the entire section is concerned only with agreements intended to govern divorce situations.

> "It is a basic rule of contract interpretation that a court 'cannot redraft the agreement, but must adopt that construction which will result in a reasonable, fair and just contract as opposed to one that is unusual or extraordinary.' *Jones v. Jenkins,* 88 Wis. 2d 712, 722, 277 N.W.2d 815 (1979). As we stated in *Voluntary Assign. of Watertown Tr. & Equip. Co.,* 94 Wis. 2d 622, 637, 289 N.W.2d 288 (1980):
>
> " '[T]he language of a contract must be understood to mean what it clearly expresses, and the courts may not depart from the plain meaning of a contract when it is free from ambiguities. . . .' " *United Farm Agency of Wisconsin, Inc. v. Klasen,* 112 Wis. 2d 634, 641, 334 N.W.2d 110 (1983).

The circuit court justified its construction of the agreement as applicable to divorce as well as to probate by asserting that:

> "The court also believes that not only was the agreement drawn up with valid family considerations in mind, but also to disavow the contract would be to create the very situation once outlawed by our state. That is, Ms. Cahlamer would stand to gain more through a divorce action than through a probated estate. Had she remained married and Dr. Levy died, she, under the contract, would receive far less than she is asking for at this time. Clearly then, if she is awarded more through a divorce, it would promote parties in similar circumstances to commence divorce actions rather than await the death of their spouses."

The court relied on sec. 767.255, Stats., as a basis for its reasoning. Section 767.255 instructs the trial court to presume that all property is to be divided equally between the parties. In addition, however, the statute lists 12 factors, including, "Such other factors as . . . may . . . be relevant," for the court to consider in making an unequal division of property. The circuit court in this case erred when it assumed that Mary would automatically receive more under sec. 767.255 than she would under the terms of the premarital agreement as construed by the circuit court. In fact, the judge inconsistently reached just the opposite conclusion when she looked at the equitableness of the premarital agreement at the time of the divorce. The circuit court considered the same factors it would have considered were there no agreement between the parties (*e.g.,* length of marriage, property brought into the marriage, contribution of each party to the marriage) and concluded:

> "[T]here is, nonetheless, nothing peculiar to the circumstances in this case which leads this court to believe the vast accumulation of assets was a result of anything but Dr. Levy's professional skills and talents. Thus, it appears that there is nothing in the relationship of the parties during the marriage which adversely affects the contractual relationship of the parties."

■ While the contractual relationship resulted in an unequal division of the property, there is no reason to assume a similar division would not have occurred under sec. 767.255. The judge's rationale for construing the agreement is unpersuasive. It is unlikely that the exclusion of this particular premarital agreement and

the application of the statute would open the floodgates and promote others to "commence divorce actions rather than await the death of their spouses."

██ The circuit court's finding that this premarital agreement is applicable to the divorce when divorce was never mentioned violates basic rules of contract construction.[4] In the guise of construing a contract, courts cannot insert what has been omitted or rewrite a contract made by the parties. *Batavian National Bank of LaCrosse v. S & H, Inc.,* 3 Wis. 2d 565, 569, 89 N.W.2d 309 (1958). The construction of a contract is es-

---

[4] The judge explains that the lack of reference to divorce is due to the public policy prohibitions of the time. However, the judge also cites two cases where the court allowed admission of such agreements as a factor to be considered, although not binding, in property division. *See, Werlein v. Werlein,* 27 Wis. 2d 237, 133 N.W.2d 820 (1965); *Strandberg v. Strandberg,* 33 Wis. 2d 204, 147 N.W.2d 349 (1967). The judge relies on *Strandberg* as a case where the premarital agreement was in contemplation of death and contained no specific reference to divorce. While the *Strandberg* court allowed the agreement to "be considered," it would not specifically enforce it. At that time, premarital agreements pertaining to divorce were void as against public policy and the court held that:

> "[T]o give substantial or controlling effect to an antenuptial agreement upon the divorce of the parties would be doing indirectly or by analogy what cannot be done directly by the parties. The contract may be considered but not specifically enforced." 33 Wis. 2d at 209–10.

Similarly, in *Werlein, supra* at 241, the court stated that the agreement that was applicable only to death was a circumstance to be considered, but not a circumstance of any weight in respect to a divorce. In general, neither *Werlein* nor *Strandberg* support the proposition that an antenuptial agreement relating only to death furnishes a basis for making a division of property upon divorce.

sentially one of determining the intent of the parties. *Armstrong v. Colletti,* 88 Wis. 2d 148, 153, 276 N.W.2d 364 (1979). The recital or whereas clause of a contract may be examined to determine the intention of the parties. *Henry G. Meigs, Inc. v. Empire Petroleum Co.,* 273 F.2d 424, 428 (7th Cir., 1960). The whereas clause of this premarital agreement recites:

> "WHEREAS, it is the intention of both Dr. Levy and Miss Cahlamer that their respective rights in each other's property and estate accruing by law or otherwise, both during the term of such marriage and *upon the termination thereof by the death of one or both of the parties hereto,* shall be determined and fixed solely and entirely by this Agreement." (Emphasis supplied.)

The words, "divorce" or "separation," never appear in the document. The circuit judge received, without objection, testimony that neither party contemplated, at the execution of the premarital agreement, that it would apply to divorce or separation. At the November 18, 1981, hearing, the following colloquy took place between Mary Cahlamer and her attorney:

"Q. In your mind in respect to Exhibit No. 22— well, it's part of Exhibit No. 22, pages No. 11 to No. 22 designated 'Agreement,' did you believe this document had anything to do with divorce?

"A. No, I did not.

"Q. Were you contemplating divorce at the time— Did you have divorce on your mind or contemplate divorce at the time you executed this document?

"A. No. I loved my husband and I had no intentions of divorce.

"Q. So far as your understanding of this divorce, how did you understand this document to be when it become effective if it would become effective?

"A. I understood the document meant that it would become effective if my husband died shortly after the commencement of the marriage."

Dr. Levy also stated in his deposition that divorce was not contemplated at execution of the agreement:

"Q. There was no discussion regarding divorce, was there?

"A. No. I don't think either of us entered the marriage contemplating the divorce would be the cause of—or forthcoming."

At oral argument in this court, while the parties differed as to the correctness of the circuit judge's construction of the agreement, neither party objected to statements in the record demonstrating that the intent of both parties at execution was to enter into an agreement operative only at death.

In addition, this court has said that the best indication of the intent of the parties is the language of the contract itself. *In Matter of Estate of Alexander,* 75 Wis. 2d 168, 181, 248 N.W.2d 475 (1977). When unambiguous language is construed as if it were ambiguous, the resulting interpretation is contradictory and confusing. The antenuptial contract, on its face, unambiguously referred only to a division of property at death. Nevertheless, the circuit judge determined that the entire agreement applied to divorce although that word is never used. The judge concluded that "failure to specifically mention divorce in the antenuptial agreement is not fatal to the court's accepting the agreement [to apply to divorce]." At the same time,

535

however, the judge determined that failure to mention divorce was a fatal deficiency that precluded any maintenance award to the wife:

> "Secondly, the agreement of the parties called for Dr. Levy to support her during the marriage but not afterwards. The court notes the following language: *'During the marriage,* [emphasis added by circuit court] Dr. Levy will bear and pay all necessary expenses of operating and maintaining the residence from time to time occupied by Dr. Levy and Ms. Cahlamer . . .' (page 5 of the agreement); and: *'During the marriage,* [emphasis added by circuit court] Dr. Levy will also bear and pay all normal, necessary and proper expenses for the support, medical care and maintenance of Miss Cahlamer, including all normal clothing and other usual and normal living expenses.' (page 6 of the agreement) ". . .
>
> "It is the court's finding that Dr. Levy, per the agreement, was obligated to support Ms. Cahlamer only during the marriage."

Surely, a document only contemplating the death of a spouse cannot be reasonably expected to include a provision for continued support after the marriage is dissolved by divorce. It is not reasonable that the circuit judge finds that the lack of the word, "divorce," in the agreement means that the parties intended no support, while at the same time she finds that the omission of the word, "divorce," throughout the agreement means the parties intended divorce to be included as a predicate for the division of property.

The testimony of the parties and the language of the agreement leave no question that the premarital agreement was intended to apply at death only and not

at divorce. Because the agreement used by the circuit court to make the property division was not applicable, the decision of the court of appeals is reversed and the cause is remanded for consideration of the property division as provided by sec. 767.255, Stats.

*By the Court.*—Decision reversed, and cause remanded to the circuit court with directions.