# IN RE the MARRIAGE OF: Betty L. WEBB, Petitioner-Appellant,†

## v.

## James C. WEBB, Respondent.

Court of Appeals

*No. 88–0872. Submitted on briefs November 30, 1988.—Decided December 28, 1988.*

(Also reported in 434 N.W.2d 856.)

† Petition to review denied.

On behalf of the petitioner-appellant the cause was submitted on the briefs of *Craig W. Nelson* of *Piette, Nelson, Zimmerman & Dries, S.C.,* of Milwaukee.

On behalf of the respondent the cause was submitted on the brief of *Anthony R. Varda* of *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C.,* of Madison.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

NETTESHEIM, J. Betty J. Webb appeals from a divorce judgment which enforced an antenuptial agreement entered into with her husband, James. Betty argues that the trial court erred by refusing an amendment to her divorce petition which sought to raise the issue of the agreement's application to this divorce under *Levy v. Levy,* 130 Wis. 2d 523, 388 N.W.2d 170 (1986). After denying Betty's request, the trial court nonetheless went on to address the merits of the very issue which Betty unsuccessfully sought to raise by her amendment. The court ruled that *Levy* did not control and that the agreement was applicable to this divorce action. Betty appeals both rulings.

Because the trial court addressed the ultimate question of the agreement's application to this divorce, we need not address whether the court properly denied the amendment to Betty's petition. We conclude the court correctly interpreted the agreement. Therefore, we affirm the judgment.

On October 25, 1977, the parties entered into an antenuptial agreement. The parties were subsequently married on January 1, 1978. The agreement was drafted by Attorney Gus Harms, who was professionally and socially acquainted with both parties and who also represented the George Webb Corporation. The parties did not have separate counsel and it appears that Attorney Harms drafted the agreement at the request of both parties. The George Webb Corporation paid Attorney Harms' fee.

The agreement, in relevant part, provides:

WHEREAS, both of the said parties desire to provide for their own children and/or grandchildren without regard to the marital rights of spouses as determined by Wisconsin law except as otherwise herein provided; and

WHEREAS, Betty L. Faust desires and agrees to waive any and all marital rights that she possesses, either as wife, widow, heir-at-law, next of kin, or distributee upon the death of James C. Webb, except as otherwise herein provided; and

WHEREAS, James C. Webb desires and agrees to waive any and all marital rights either as husband, widower, heir-at-law, next of kin or distributee upon the death of Betty L. Faust, except as otherwise herein provided;

NOW, THEREFORE, in consideration of the premises, and for other good and valuable consideration, the parties hereto agree as follows:

1. Betty L. Faust hereby waives, discharges and releases any and all right, title or interest whatsoever which she may have acquired or acquire in the future in the property, now owned or hereafter acquired, of James C. Webb at any time by reason of the said contemplated marriage.

2. James C. Webb hereby waives, discharges and releases any and all right, title or interest whatsoever which he may have acquired or acquire in the future in the property, now owned or hereafter acquired, of Betty L. Faust, at any time by reason of the said contemplated marriage.

3. Each party waives, discharges and releases any and all claims and rights that he or she may acquire under Wisconsin law, or the law of any other state, by reason of the contemplated marriage:

A. To share in the estate of the other party upon the latter's death by way of dower, courtesy, widow's allowance, statutory allowance or distribution in intestacy, or in any other manner whatsoever except as otherwise herein provided;

B. To elect to take against the other party's Last Will and Testament.

During the marriage, both parties worked for the George Webb Corporation. Betty served in an executive role. In that capacity, she received stock from the corporation and was obligated under a stock repurchase agreement with the corporation. This agreement allowed the corporation at its option to repurchase Betty's stock for book value.

In 1985, in anticipation of the sale of the business, the corporation negotiated the repurchase of Betty's stock for the total amount of $201,001.64. Following the sale, she requested additional payment from James for her holdings. As a result, Betty was paid an additional $8250. This agreement was linked to the impending divorce since it also referenced certain other property owned by the parties.

Betty commenced this action in November 1985. Her petition alleged the agreement's existence and attached a copy. Later, in July 1986, the parties entered into a written stipulation which was filed with the court. This stipulation cited the antenuptial agreement and represented:

> that ... all disputes in their divorce action are settled and compromised according to this Stipulation, and that the following terms and conditions may be incorporated into the Findings of Fact and Conclusions of Law and Judgment of Divorce:
>
> 1. ANTENUPTIAL AGREEMENT. The parties hereto have entered into an Antenuptial Agreement dated October 25, 1977, a copy of which document is attached hereto. The terms of said Agreement are fair and reasonable under the circumstances of this case and hereby incorporated herein as though fully set forth.

Although the record is not clear, it appears that thereafter at a pretrial conference Betty sought to again raise the question of her compensation for the repurchase of her stock by the corporation. The trial order resulting from this conference recites that among the issues to be tried is "[r]epurchase of Betty's stock in Webb Corp." This order further provided, "[a]ny pleadings to be amended within 30 days." The trial order does not indicate any issue concerning the agreement's application to this action nor any issues under *Levy*.

Five days after the deadline for amending the pleadings, Betty brought a motion seeking leave to file an amended petition, alleging for the first time that the antenuptial agreement did not govern this case. She filed the proposed amended petition with her motion.

After conducting a hearing on the motion, the trial court denied Betty's request to amend her petition. However, anticipating an appeal on this procedural ruling, the court also conducted a hearing, including the taking of evidence, on the substantive issue of whether the agreement was intended to apply to a divorce action. At the close of Betty's evidence on this question, and without requiring James to present a "defense," the court ruled that Betty had failed to make out a prima facie case. Betty appeals.

The construction of a written contract is a matter of law. *Levy*, 130 Wis. 2d at 528, 388 N.W.2d at 172. We determine such a question without deference to the conclusions reached by the trial court. *Id.* at 529, 388 N.W.2d at 172-73. We also note, however, that in this case the court received parol evidence on the question of the interpretation of the agreement.[1] Both Attorney

---

[1]This evidence was received without objection.

Harms and Betty testified on this issue. The assessment of this testimony is for the trial court, the finder of fact, and we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Sec. 805.17(2), Stats.

We look first to the agreement itself. Both parties agree that the agreement applies to a death situation. In this respect the agreement is clear and unambiguous.

Certain portions of the agreement, we conclude, support James' claim that the agreement also contemplates a divorce situation. The sixth "Whereas" clause recites that both parties desire to provide for their respective families "without regard to the marital rights of spouses as determined by Wisconsin law ...." Certainly the marital rights of both parties under Wisconsin law would include those accorded in a divorce action.

By the seventh and eighth "Whereas" clauses, James and Betty waive their marital rights not only in terms of their status as a surviving spouse, but also as husband and wife, respectively. This language is at least ambiguous as to whether the waiver is intended to apply to a nondeath situation. Also ambiguous is whether the concluding phrase in each of these clauses—"upon the death of [the other] ...."—is intended to apply to all of the previously recited spousal categories, including husband and wife, or only those which would clearly apply in a death situation (widow[er], heir-at-law, next of kin, or distributee).

Paragraphs one and two of the agreement are perhaps the most compelling in support of the trial court's ruling. By these paragraphs, Betty and James respectively:

"waives, discharges and releases *any and all right, title or interest whatsoever which [s]he may have acquired or acquire in the future in the property, now owned or hereafter acquired, of [the other] at any time by reason of the said contemplated marriage.* [Emphasis added.]

The very next paragraph of the agreement then goes on to expressly address a death situation. We rhetorically inquire why the broad language of paragraphs one and two was necessary if the agreement was intended to apply only to the death situation addressed in paragraph three.

For all of the above reasons, we conclude that the agreement was intended to apply to both a death and divorce situation.

*Levy* does not control because the agreement in this case is not as clearly drawn on this point as the *Levy* agreement. In *Levy,* the agreement on its face unambiguously referred only to a division of property at death. *Levy,* 130 Wis. 2d at 535, 388 N.W.2d at 175. The same cannot be said of the agreement here.

Certain of the parol evidence also supports our conclusion. Attorney Harms testified that he drew the agreement with a divorce scenario in mind. Although he could not testify that he advised the parties of this consequence, he did testify that this was his usual practice. Although Betty testified that the agreement was not intended to apply to a divorce situation, her position on this question is impeached by her original proffering of the agreement to the court on a basis upon which the property of the marriage should be divided. While Betty presented an explanation for this reversal of position, it is obvious that the court was not persuaded by her testimony and explanation. We will

not substitute our judgment for that of the trial court on a matter relating to a witness' credibility.

Here again, this case is distinguished from Levy. There, both parties to the contract testified, in keeping with the agreement's clear language, that they did not intend the agreement to apply to their divorce. *Id.* at 534–35, 388 N.W.2d at 175. Here the testimony is not in accord on this question and that which supports a "death only" theory stands impeached.

Finally, Betty challenges the agreement on equitable grounds under *Button v. Button,* 131 Wis. 2d 84, 388 N.W.2d 546 (1986). We deem this issue waived. Betty never challenged the agreement on *Button* grounds. As noted, her sole claim was that the agreement should not be enforced under *Levy.*[2] We therefore do not address this issue on its merits. *See Wirth v. Ehly,* 93 Wis. 2d 433, 443, 287 N.W.2d 140, 145 (1980).

*By the Court.*—Judgment affirmed.

---

[2]We note that trial court did conclude that the requirements of *Button* had been met.