#30169-a-SRJ
**2024 S.D. 34**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JULIE ANNE LIEBEL,                               Plaintiff and Appellant,

   v.

GARY LEE LIEBEL,                                 Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
CODINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CARMEN MEANS
Judge

* * * *

TIM HOGAN
BRIAN ZIELINSKI of
Ribstein & Hogan Law Firm
Brookings, South Dakota          Attorneys for plaintiff and
appellant.


MELISSA E. NEVILLE of
Bantz, Gosch & Cremer, LLC
Aberdeen, South Dakota         Attorney for defendant and
appellee.

* * * *

CONSIDERED ON BRIEFS
AUGUST 29, 2023
OPINION FILED **06/26/24**

#30169

JENSEN, Chief Justice

[¶1.]　　　　Julie and Gary Liebel married in 2010 and divorced in 2022.　The circuit court granted Gary a divorce from Julie on the grounds of adultery and applied a premarital agreement (Agreement) signed by the parties to divide their assets.　Julie appeals, arguing the court erred in applying the Agreement to the property division in the divorce and abused its discretion in classifying and distributing the parties' property.　We affirm.

## Factual and Procedural Background

[¶2.]　　　　The parties first met in 2004 at a bar and restaurant Gary owned in Florence, South Dakota, and began dating in 2008.　Both had been married and divorced twice.　Gary has two adult children, while Julie does not have children. Julie resided in Watertown, South Dakota, where she owned and operated a travel agency.　She moved into Gary's Florence home after they began dating.

[¶3.]　　　　Because of their prior marriages and the assets Gary had accumulated, the parties discussed a premarital agreement before marrying.　Each prepared personal financial statements and met with attorney John Foley to draft the Agreement.[1]　The Agreement named the parties, identified their respective personal financial statements, which were attached as exhibits, and indicated their plans to marry.　The Agreement stated that "it is mutually desired and agreed by the parties that the assets of each of the parties shall remain separate and be subject to the sole control and use of its owner as well after as previous to the solemnization of said marriage," and included the following terms:

---

1.　　　Foley passed away before these proceedings commenced.

-1-

1. That the estate of [Gary] shall remain and be his separate property, subject entirely to his individual control and use, the same as if he were unmarried; and that [Julie] shall not acquire by force of the contemplated marriage, for herself, her heirs, her assigns or creditors, any interest in his property or estate, or right to the control thereof, or any interest in the income, increase, rents, profits or dividends arising therefrom; and it is further agreed that any property that [Gary] may hereafter acquire or become entitled to shall be owned and held by him as though he had acquired it before the solemnization of said marriage; and [Julie] hereby agrees in consideration of the contemplated marriage and of the covenants of [Gary] herein set forth, that she will waive, release and relinquish unto [Gary] all right to the use and control of his separate property and estate and the income therefrom; and further agrees that [Gary] shall have the right at all times to dispose of any part or all of his separate property and estate by deed, will or otherwise, on his sole signature, hereby ratifying and consenting on her part to any and all such disposition of his said property or estate.

2. [This paragraph recites reciprocal terms as to Julie's property.]

3. The parties hereto expressly further agree and covenant with each other that on the death of either, the survivor shall not have and will not assert any claims, interest, estate or title, under the laws of any state, because of such survivorship, in or to the property, real, personal or mixed, or life insurance, of which such deceased party may die seized or possessed, except as hereinafter provided[.] . . .

4. It is also understood that the parties may subsequently wish to place a portion of their property in joint tenancy with right of survivorship.  In the event that any such property is placed in [the name of the parties,] as joint tenants with right of survivorship, it is understood and agreed that such joint tenancy property may vest in the survivor upon the death of one of the parties.  In other words, this agreement is not intended to limit the right of either of the parties to place property in joint tenancy or to make gifts to one another if such actions are the result of the act of one or both of the named parties to this agreement; if this paragraph should be in conflict with any other provision in this agreement, this paragraph shall govern.

> . . .
>
> 6. The parties hereto have read the above agreement, and each of them knows the contents thereof and fully understands all of the terms and conditions contained herein.
>
> . . .
>
> 9. That the parties have consulted and have been advised of their rights, under the laws of the State of South Dakota.
>
> . . .

The parties signed the Agreement on April 7, 2010. They were married on April 20, 2010.

[¶4.] Around the time the parties married, they moved into a rental property in Watertown. The following year, Gary deposited funds he had accumulated prior to the marriage into a joint checking account. Gary also received approximately $25,000 from the sale of a home he owned prior to the marriage that was deposited into the joint account. The parties used these premarital funds to purchase an undeveloped lot in Watertown in both their names as joint tenants with rights of survivorship and began to build a home. Gary also paid some of the contractors working on the construction of the home with premarital funds. Both parties executed a construction loan and a ten-year mortgage in the amount of $150,000 to finish the home. They moved into the home in 2011.

[¶5.] Gary testified that nearly all the monthly household expenses were paid from the joint account and that he deposited all the funds into the joint account from premarital funds or his wages during the marriage. He further testified that he deposited funds each month to pay the home mortgage from monies received on a contract for deed from the sale of a bar and restaurant he owned prior to the

marriage. Julie maintained a separate account where she deposited her earnings. She testified that she purchased groceries and paid some of the utilities from this account.

[¶6.]		In December 2013, Gary received the balance of $177,000 owed on the contract for deed from the sale of his restaurant and bar he owned prior to the marriage. From this amount, Gary paid the remaining balance owed on the home mortgage in the amount of $125,000. He used the remaining funds to purchase one or more vehicles. The parties executed a warranty deed on June 24, 2016, taking the home out of joint tenancy and conveyed an undivided one-half interest to Julie and the other one-half to a trust Gary created for his grandchildren.

[¶7.]		Julie filed for divorce on August 11, 2021, on the grounds of extreme cruelty. Shortly after filing for divorce, Julie traveled to the Sturgis Motorcycle Rally with a former coworker she referred to as her friend. She had made a hotel reservation but instead stayed with her friend in his cabin. Gary filed an answer and counterclaim seeking a divorce on the grounds of extreme cruelty and adultery.

[¶8.]		On March 15, 2022, Julie filed an action for a protection order against Gary. She had been living at her parents' residence, and claimed Gary entered the attached garage of her parents' home without permission and left a note on a toolbox. Gary shared a video with police that appeared to show that the note had already been on the toolbox when Julie was moving her belongings out of the marital home. Julie withdrew her request for a protection order just before the scheduled hearing; however, in the divorce proceeding, the court awarded Gary the attorney fees he had incurred in the protection order proceeding.

[¶9.]     With respect to property division, Julie argued that the marital home was marital property under the terms of the Agreement and that the Agreement was unenforceable as to other property. Julie also claimed that she did not voluntarily enter into the Agreement and that it was unconscionable. Notwithstanding the extensive personal financial statements included with the Agreement, she claimed to have met with Foley only one time. She contends that during this meeting she was instructed to sign the Agreement and financial statement without having had an opportunity to review them. She also claimed that Gary told her he would not marry her if she did not sign. Julie further argued that the parties did not intend for the Agreement to apply in the event of divorce because it did not mention divorce. Julie did not seek alimony.

[¶10.]    Gary argued that the Agreement was valid and enforceable. He testified that they both met with Foley three times before executing the Agreement and that Foley was Julie's family attorney and represented them both with respect to the Agreement. Gary also maintained that the parties intended the Agreement to apply to the division of assets in the event of divorce and that it was because of their prior marriages that they entered into a premarital agreement. He argued that "[t]he fact that this marriage is ending in divorce should not make separate property joint property" when the Agreement "does not explicitly mention divorce, separation, alimony, or property settlement, but repeatedly references separate property, the parties' respective estates, and their marriage." He alternatively argued that even if the Agreement did not apply, the circuit court should exclude the property that each party owned prior to the marriage.

[¶11.]    At the time of trial, Julie, age 57, continued to operate her travel business part-time out of her home and worked at a bank. Gary, ten years Julie's senior, was receiving social security benefits and remained employed part-time as an engineer. Gary testified that he planned to fully retire soon. The parties stipulated to exhibits, including a joint property spreadsheet, the Agreement, the deed conveying the marital home to the parties as joint tenants, the deed conveying the marital home to Gary's trust and Julie as tenants in common, the mortgage on the marital home, the county assessment of the marital home, and their tax returns.

[¶12.]    Following the trial, the court issued a memorandum decision, findings of fact and conclusions of law, and a judgment and decree of divorce. The court granted a divorce to Gary on the grounds of adultery. The court found Gary more credible than Julie on several issues, including their differing versions of the events leading up to the execution of the Agreement. Based upon these findings, the court determined that the Agreement was valid and enforceable in the context of divorce. The court also found that the Agreement unambiguously governed the division of property in the event of divorce. Relying on *Ryken v. Ryken*, 440 N.W.2d 300 (S.D. 1989), the court acknowledged that while "the [A]greement contain[ed] no express language about divorce, separation, alimony, or property settlement . . . it may still be regarded as applicable in a divorce action[.]"

[¶13.]    Consistent with the terms of the Agreement, the court treated the marital home, which was held jointly, as marital property. The court found that both parties provided more than a de minimis contribution toward the home but

determined that it was equitable for Gary to receive a greater share because he contributed more financially and was ten years older than Julie.

[¶14.] Applying the Agreement, the court treated most of the remaining property as nonmarital. Gary received the bulk of the nonmarital property valued at $713,705. The court valued the net marital assets at $214,262. Upon division of the net marital assets, Julie was awarded marital property valued at $35,482, while Gary received marital property valued at $134,535. The court ordered Gary to make a cash equalization payment to Julie in the amount of $49,526, less $2,062.80 in attorney fees awarded to Gary for defending the protection order that the court determined Julie filed maliciously. The result of the order was a net payment from Gary to Julie in the amount of $47,463.20. The court also ordered Julie to quitclaim her interest in the marital home to Gary upon receipt of the payment.

[¶15.] Julie appeals and raises the following issues:

1. Whether the circuit court erred in concluding that the Agreement applied to the parties' divorce.

2. Whether the circuit court abused its discretion in valuing and dividing the marital property.

**Standard of Review**

[¶16.] Premarital agreements are contracts, and "[o]ur standard of review for contract interpretation is well-settled: '[c]ontract interpretation is a question of law reviewed de novo.'" *Charlson v. Charlson*, 2017 S.D. 11, ¶ 16, 892 N.W.2d 903, 907–08 (quoting *Poeppel v. Lester*, 2013 S.D. 17, ¶ 16, 827 N.W.2d 580, 584). The court has broad discretion in classifying and dividing the property of the parties. *Dunham v. Sabers*, 2022 S.D. 65, ¶ 39, 981 N.W.2d 620, 637 (quoting *Ahrendt v.*

*Chamberlain*, 2018 S.D. 31, ¶ 10, 910 N.W.2d 913, 918). "We review findings of fact 'under the clearly erroneous standard. This Court must be left with a definite and firm conviction that a mistake has been made to overturn a circuit court's findings.'" *Id.* ¶ 27, 981 N.W.2d at 633 (quoting *Roberts v. Roberts*, 2003 S.D. 75, ¶ 8, 666 N.W.2d 477, 480).

## Analysis

[¶17.]     "When interpreting a contract, this Court looks to the language that the parties used in the contract to determine their intention." *Charlson*, 2017 S.D. 11, ¶ 16, 892 N.W.2d at 908 (quoting *Detmers v. Costner*, 2012 S.D. 35, ¶ 20, 814 N.W.2d 146, 151). "In order to ascertain the terms and conditions of a contract, we examine the contract as a whole and give words their plain and ordinary meaning." *Id.* (quoting *Nygaard v. Sioux Valley Hosps. & Health Sys.*, 2007 S.D. 34, ¶ 13, 731 N.W.2d 184, 191).

[¶18.]     "South Dakota is an all property state, meaning all property of the divorcing parties is subject to equitable division by the circuit court, regardless of title or origin." *Dunham*, 2022 S.D. 65, ¶ 39, 981 N.W.2d at 636 (quoting *Osdoba v. Kelley-Osdoba*, 2018 S.D. 43, ¶ 18, 913 N.W.2d 496, 502). "Before dividing property, the court must classify it as marital or nonmarital." *Id.* (quoting *Ahrendt*, 2018 S.D. 31, ¶ 8, 910 N.W.2d at 918). "[T]he principal rule for analyzing a discrete claim of separate property provides that '[o]nly where one spouse has made no or de minimis contributions to the acquisition or maintenance of an item of property and has no need for support, should a court set it aside as "non-marital" property.'" *Id.* (alterations in original) (quoting *Field v. Field*, 2020 S.D. 51, ¶ 18, 949 N.W.2d 221,

225).  Additionally, we have said that the circuit court should consider the following factors both when it classifies and divides property:

> (1) the duration of the marriage;
> (2) the value of the property owned by the parties;
> (3) the ages of the parties;
> (4) the health of the parties;
> (5) the competency of the parties to earn a living;
> (6) the contribution of each party to the accumulation of the property; and
> (7) the income-producing capacity of the parties' assets.

*Id.* ¶ 40, 981 N.W.2d at 637 (quoting *Ahrendt*, 2018 S.D. 31, ¶ 10, 910 N.W.2d at 918).  "In 'divid[ing] property in divorce proceedings, "there is no rigid formula that must be followed, nor any fixed percentage to which either party is entitled."'" *Id.* ¶ 40 (alteration in original) (quoting *Osdoba*, 2018 S.D. 43, ¶ 19, 913 N.W.2d at 502).  "[T]he law does not require perfection that would approach mathematical certainty." *Id.* ¶ 40 (alteration in original) (quoting *Osdoba*, 2018 S.D. 43, ¶ 18, 913 N.W.2d at 502).

### 1. *Premarital Agreement*

[¶19.]	Julie unsuccessfully argued below that the Agreement was unenforceable under both voluntariness and unconscionability theories.  The circuit court also rejected her claim that the parties did not intend the Agreement to apply in the event of divorce, reasoning that "[t]he Premarital Agreement does not specifically say divorce but essentially says that each party will retain his or her own separate property and shall gain nothing from the other due to the marriage relationship."

[¶20.]	On appeal, Julie limits her argument to the interpretation of the Agreement itself.  She maintains that the plain language of the Agreement does not

evidence a clear intent for it to apply to divorce. She contends, based upon this Court's prior decisions in *Roth v. Roth*, 1997 S.D. 75, 565 N.W.2d 782, and *Smetana v. Smetana*, 2007 S.D. 5, 726 N.W.2d 887, that the circuit court should have divided the property without any reference to the Agreement. She further argues that like the agreements in *Roth* and *Smetana*, the general language of the Agreement does not state that it is applicable to a divorce, nor does it reference the party's rights in the event of divorce. She, therefore, maintains it cannot control the division of property in conjunction with a divorce.

[¶21.]     Gary argues that the language of the Agreement shows a clear intention to apply to the disposition of the assets in the event of a divorce and that a premarital agreement need not contain the word "divorce" in order for its provisions to apply to a divorce. He contends that the Uniform Premarital Agreement Act (UPAA), adopted in South Dakota,[2] permits the parties to provide for the

---

2.     SDCL 25-2-18 approves the use of premarital agreements and the ability of parties to contract with respect to the rights and obligations of property as between spouses, prior to their marriage:

>       (a) Parties to a premarital agreement may contract with respect to:
>           (1) The rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located;
>           (2) The right to buy, sell, use, transfer, exchange, abandon, lease, consume, expend, assign, create a security interest in, mortgage, encumber, dispose of, or otherwise manage and control property;
>           (3) The disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event;
>           (4) The making of a will, trust, or other arrangement to carry out the provisions of the agreement;

(continued . . .)

"disposition of property" upon a "marital dissolution," but it also allows the parties to define the interests of each party in "any of the property" acquired before or after the marriage irrespective of whether this language is specifically tied to divorce proceedings. Gary argues that the Legislature could have created a requirement that a premarital agreement must expressly refer to a divorce if it wanted to do so, but it did not.

[¶22.]    Gary also cites *Ryken*, a case decided before the UPAA, for the proposition that using a phrase other than "divorce" could still result in a premarital agreement applying to subsequent divorce proceedings. 440 N.W.2d at 304 (determining that the circuit court erred in finding a premarital agreement was inapplicable to divorce when it referred to "legal proceedings"). Gary points to the language giving a party "the right at all times to dispose of any part or all of [the party's] separate property." Gary also asks the Court to revisit our prior decisions in *Roth* and *Smetana*, and argues that the "settled law" from other jurisdictions that these cases relied upon was not so settled.[3]

---

(. . . continued)

(5) The ownership rights in and disposition of the death benefit from a life insurance policy;
(6) The choice of law governing the construction of the agreement; and
(7) Any other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty.

(b) The right of a child to support may not be adversely affected by a premarital agreement.

3.    Gary references cases relied upon in *Roth*, including: *Parkhurst v. Gibson*, 573 A.2d 454 (N.H. 1990); *Foster v. Foster*, 609 A.2d 1171 (Me. 1992); *Levy v.*

(continued . . .)

[¶23.]     In ascertaining whether the parties intended the Agreement to apply in the event of divorce, we start with its language. In the introductory provisions of the Agreement, the parties "mutually desired and agreed . . . that the assets of each of the parties shall remain separate and be subject to the sole control and use of its owner as well after as previous to the solemnization of said marriage[.]" The parties also agreed that the separately owned property would be "subject entirely to [the owner's] individual control and use, the same as if [the owner] were unmarried; and that [the other party] shall not acquire by force of the contemplated marriage . . . any interest in [the owner's property] . . . any interest in the income, increase, rents, profits or dividends arising therefrom . . . [including any after acquired property]."

[¶24.]     The language of the Agreement is clear that neither party acquired any interest in the other party's separately owned property because of the marriage

---

(. . . continued)

> *Levy*, 388 N.W.2d 170 (Wis. 1986); and *Devault v. Devault*, 609 N.E.2d 214 (Ohio 1992). The *Roth* Court found it significant that these courts held that when a premarital agreement does not explicitly reference divorce, it may not apply to divorce proceedings. *Roth*, 1997 S.D. 75, ¶¶ 13–14, 565 N.W.2d at 785–86. Gary argues, however, that more recent decisions have not required an explicit reference to divorce as a condition to enforcing premarital agreements. *See Fletcher v. Fletcher*, 628 N.E.2d 1343, 1347 (Ohio 1994) (although the antenuptial agreement "never specifically mentioned divorce[,]" the court nevertheless found that "the parties intended the agreement to apply to divorce" because the agreement waived all "past, present and future support [or] division of property" that would accrue because of their marriage); *Sabad v. Fessenden*, 825 A.2d 682, 692–93 (Pa. Super. 2003) (despite the agreement's "fail[ure] to mention what should happen in the event of a divorce" the court determined that it was still intended to apply to divorce proceedings because it addressed that the parties' "property [was] to be separately owned . . . as if no marriage had been consummated between them.").

and separately owned property would be treated as if the parties had never married. This includes any income or growth during the marriage and any separate property acquired during the marriage. A plain and ordinary reading of these words can only be understood to mean that the parties did not intend to create, before, during, or upon termination of the marriage, any interest in the other party's separately owned property. However, Julie relies upon our decisions in *Ryken*, *Roth*, and *Smetana* to support her claim that in the absence of specific language addressing a divorce or legal proceedings, a premarital agreement should be read to be inapplicable to divorce.

[¶25.] In *Ryken*, neither party argued that the premarital agreement was ambiguous, and the Court relied solely upon the language of the premarital agreement to discern the parties' intentions. The Court reversed the circuit court's determination that the agreement was inapplicable to the divorce, relying exclusively upon the language that, "[t]his contract limits the right of either party to participate in the estate of the other, whether the marriage relation is determined by death or legal proceedings." *Ryken*, 440 N.W.2d at 304 (alteration in original). *Ryken* explained that "[d]ivorce actions are legal proceedings. The provision, although artlessly worded, indicates that the agreement could apply in a divorce context." *Id.* The Court remanded the case for the circuit court to consider a separate challenge to the validity of the premarital agreement. *Id.*

[¶26.] *Roth* was decided after the Legislature enacted the UPAA, but the Court did not reference the UPAA in considering whether the parties intended the premarital agreement to apply to divorce proceedings. The premarital agreement in

*Roth* "provide[d] that 'it is desired by the parties that their marriage shall not in any way change their legal right or that of their children and heirs in the property of each of them.' . . . However, there [was] no provision in the agreement in which the words divorce, alimony, or property settlement [were] mentioned." 1997 S.D. 75, ¶ 10, 565 N.W.2d at 784. A three-justice majority in *Roth* reversed the circuit court's application of the premarital agreement to the divorce and concluded that the agreement unambiguously applied to the distribution of property upon death, but "[a] review of the four corners of the document reveal[ed] the [premarital agreement] fail[ed] to mention divorce or separation in any manner." *Id.* ¶ 17, 565 N.W.2d at 786. Considering decisions from South Dakota and other jurisdictions, the Court stated:

> [T]here is no specific statement as to the effect of a divorce or separation or the like. There is also no general reference to "legal proceedings" as in *Ryken*, 440 N.W.2d at 304. As stated previously, such broad provisions stating the parties' desire to have their property separate do not automatically encompass divorce, especially when there are specific clauses in the agreement which all fail to mention divorce.

*Id.* (citations omitted). The Court further observed that if the parties meant for the premarital agreement to apply in the event of divorce, "it certainly would not have been too onerous of a task for a lawyer to insert provisions concerning divorce . . . or property settlement into the agreement." *Id.*

[¶27.] The two dissenting justices in *Roth* determined the premarital agreement's language to be ambiguous. *Id.* ¶ 30, 565 N.W.2d at 788 (Miller, C.J., dissenting). In doing so, they relied on the provisions stating that the marriage would "'not in any way change their legal right' in their respective property," "'all

property' 'shall be and forever remain the personal estate of said party[,]'" and "each party shall have at all times the full right and authority, in all respects the same as each would have if not married, to use, enjoy, manage, convey, and encumber such property as may belong to him or her." *Id.* ¶ 30, 565 N.W.2d at 788 (Miller, C.J., dissenting).

[¶28.] *Smetana*, relying on the majority opinion in *Roth*, similarly concluded a premarital agreement was inapplicable to a divorce when it failed to make any provision for the spouse in the event of divorce and "did not even mention divorce." 2007 S.D. 5, ¶ 14, 726 N.W.2d at 893. The Court also questioned the enforceability of the agreement because of the failure to provide financial information to the challenging spouse prior to the execution of the premarital agreement. *Id.* ¶ 13, 726 N.W.2d at 893. Seemingly premised upon both the pre-agreement financial nondisclosure and the premarital agreement's failure to provide for the challenging spouse, the *Smetana* Court ultimately determined the agreement was unenforceable in the divorce. *Id.* ¶ 17, 726 N.W.2d at 894.

[¶29.] *Smetana* relied on *Roth* in emphasizing that "settled law elsewhere clearly indicates 'an agreement that did not contain any reference to divorce, and recited that it only affected the parties' rights during marriage or upon death, could not be employed by a divorce court as if it were the property settlement in the dissolution proceedings.'" *Id.* ¶ 15, 726 N.W.2d at 893–94 (quoting *Roth*, 1997 S.D. 75, ¶ 13, 565 N.W.2d at 785). The Court rejected any effort to present parol evidence, determining from "[a] review of the four corners of the document" the agreement "fail[ed] to mention divorce or separation in any manner[,]" and

"conclude[d] that the [prenuptial] agreement [was] unambiguous as a matter of law as it clearly applie[d] to the distribution of property upon the death of one of the parties, not to divorce." *Id.* ¶ 16, 726 N.W.2d at 894.

[¶30.] The approach taken in *Roth* and *Smetana*, limiting the applicability of a premarital agreement to divorce proceedings in the absence of an explicit reference to the word divorce, is inconsistent with our established rules governing the interpretation of contracts. *See Charlson*, 2017 S.D. 11, ¶ 16, 892 N.W.2d at 908 ("In order to ascertain the terms and conditions of a contract, we examine the contract as a whole and give words their plain and ordinary meaning."). In doing so, *Roth* and *Smetana* focused less on the language of the agreement and more on the imprecision in drafting and what the Court believed the agreement should have said. Moreover, neither decision discussed the impact of South Dakota's statutory scheme addressing property rights as between married persons or the UPAA when considering the applicability of a premarital agreement to divorce.

[¶31.] SDCL 25-2-4 addresses the effect of marriage on separately owned property by providing that "[n]either husband nor wife has any interest in the property of the other, excepting their respective rights for support as specifically provided by law, and except that neither can be excluded from the other's dwelling." Additionally, SDCL 25-2-7 establishes the rights of a married person in separately owned property: "[e]ach spouse shall have and retain after marriage all the civil and property rights of a single person. Each may buy and sell, receive and convey, or dispose of by will, or otherwise dispose of any real or personal property belonging to

him or her or in which he or she may have an interest, without joining the name of the spouse except for the homestead."

[¶32.]     These statutes provide that a marriage generally does not create a property interest in separately owned property.[4]  This is true even in the absence of a premarital agreement.  Thus, a decision by a soon-to-be-married couple to enter into a premarital agreement shows an intention to accomplish something more than keeping ownership of property separate during the marriage.

[¶33.]     In particular, the Legislature has authorized courts to equitably divide *all* property, including separately owned property, in the event of divorce.  "When a divorce is granted, the courts may make an equitable division of the property belonging to either or both, whether the title to such property is in the name of the husband or the wife.  In making such division of the property, the court shall have regard for equity and the circumstances of the parties."  SDCL 25-4-44.[5]  The Legislature has also provided a surviving spouse a property interest in the property of their deceased spouse, irrespective of the existence of a will.  *See* SDCL 29A-2-102 (providing surviving spouse with an intestate share of decedent's estate); SDCL 29A-2-202 (right of surviving spouse to elect against decedent's will); SDCL 29A-2-

---

4.     "[O]*utside* the context of *divorce*, support, and homestead, marriage does not vest in one spouse an interest in the other's separate property."  *Scherer v. Scherer*, 2015 S.D. 32, ¶ 6, 864 N.W.2d 490, 493 (alteration and emphasis in original) (quoting *Niesche v. Wilkinson*, 2013 S.D. 90, ¶ 18, 841 N.W.2d 250, 255).

5.     SDCL ch. 25-2 also provides for certain rights and limitations on a spouse's use of separately owned property and earnings, including the right of support, and joint and several liability for certain necessary expenses.  *See* SDCL 25-2-4, -11.

301 (rights of spouse where there is a premarital will). A premarital agreement may contractually limit these rights.

[¶34.]		In 1989, the Legislature adopted the UPAA. As a part of the UPAA, SDCL 25-2-18 authorizes premarital agreements and outlines the permissible content of premarital agreements. *See* SDCL 25-2-18(a)(7) (allowing premarital agreements respecting "[a]ny . . . matter . . . not in violation of public policy or a statute imposing a criminal penalty."). The statute permits the parties to generally "contract with respect to . . . [t]he rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located[.]" SDCL 25-2-18(a)(1). Additionally, the statute permits the parties to contract specifically regarding "[t]he *disposition* of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event[.]" SDCL 25-2-18(a)(3) (emphasis added).

[¶35.]		In adopting the UPAA, the Legislature authorized prospective spouses to contract around the default rules for the disposition of assets in the event of divorce or death. Parties to a premarital agreement may accomplish this in various ways. Some may wish to specifically address "[t]he disposition of property upon . . . marital dissolution" or some "other event[.]" SDCL 25-2-18(a)(3). But other parties may wish, consistent with SDCL 25-2-18(a)(1), to contract more broadly as to "[t]he rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located[.]" By enacting the UPAA, the Legislature created a public policy that favors a liberal construction of premarital

agreements.[6]  41 Am. Jur. 2d *Husband and Wife* § 103 (1964 & Supp. 2023)

(explaining that general contract interpretation principles apply to a premarital

agreement, including reading it as a whole and giving effect to all terms where

possible, and that it is liberally construed because it is favored by public policy); 5

Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 11:8 (4th

ed. 1993 & Supp. 2023) (same).

[¶36.]        Here, the Agreement expresses an intent of each party to waive *any*

rights in the property of the other.  The Agreement specifically provides that

property "shall remain and be his separate property . . . the same as if he were

unmarried" and waives any right to "acquire by force of the contemplated marriage"

any interest in the property of the other.  The parties also agreed that the other

party "will waive, release and relinquish unto [the owner] all right to use and

control of [the] separate property" and the owner "shall have the right at all times

to dispose of" separately owned property.  We presume the Agreement proclaims

their ultimate intention.  *Roth*, 1997 S.D. 75, ¶ 17, 565 N.W.2d at 786 (citing *Carr v.*

*Benike, Inc.*, 365 N.W.2d 4, 6 (S.D. 1985)).  The absence of an explicit reference to

divorce does not defeat the obvious intent of the parties to waive the right to claim

any interest, at any time, in the separately owned property of the other.

[¶37.]        Thus, the Agreement unambiguously provides that neither spouse may

claim an interest in the separate property of the other, whether it was acquired

---

6.      However, the Legislature also recognized the unique nature of premarital
        agreements and created special rules concerning unconscionability and
        voluntariness when parties have entered into an agreement.  *See Matter of*
        *Est. of Eichstadt*, 2022 S.D. 78, 983 N.W.2d 572.

before or during the marriage. This could only be understood to mean that the other spouse would not obtain any interest in separately owned property under any circumstances, including divorce, unless mutually agreed to by creating a joint tenancy in any property. The one exception under the Agreement is a decision by the parties to create a joint interest in any property acquired by one or both parties.

[¶38.] Nothing in SDCL 25-2-18 requires the parties to specifically address the division of property in the event of divorce or to explicitly waive a spouse's right to claim an equitable division of separate property in the event of divorce under SDCL 25-4-44. The parties' decision to enter into the Agreement, which specifically provided that neither party would be entitled to receive or acquire any interest in the other's separate property at any time, demonstrates an intent to waive rights that otherwise may have arisen in the event of a divorce proceeding.

### 2. *Division of property*

[¶39.] The circuit court determined that "[t]he marital home is a marital asset to be divided equitably" because "[t]he Premarital Agreement specifically states that the parties have the right to own property jointly if they choose to do so[,]" and "[t]he marital home was held jointly." The property spreadsheet shows the court valued the marital home at $480,000 and awarded the home to Gary but only considered $120,000 of the home's value to be marital, with the remaining $360,000 in value being nonmarital. Julie does not dispute the court's valuation of the home, or the award of the home to Gary but claims that the court abused its discretion in treating $360,000 of the home's value as nonmarital property.

[¶40.] The court explained its reasoning for its classification and distribution:

> The [c]ourt concludes that [Gary] is entitled to a greater share of the marital home based upon the facts in this case. As stated earlier, [Gary] is 10 years older than [Julie] and is soon to retire. The marriage lasted 12 years. The home is unlikely to be an income-producing asset. [Gary] will likely live in the home as long as practicable. [Gary] has made far greater contributions to the property than did [Julie].

[¶41.] Julie argues that the court abused its discretion by failing to consider and weigh certain factors in distributing the home. In Julie's view, the court put too much emphasis on Gary's financial contributions and overlooked her testimony that while the marital home was being constructed, she helped in the general contractor role and contributed some physical labor. Moreover, she claims that once the home was built, she did most of the housekeeping and cooking, and contends the court failed to consider her non-financial contributions over the course of the years they were married. *See Billion v. Billion*, 1996 S.D. 101, ¶ 30, 553 N.W.2d 226, 233 (recognizing homemaking duties as a valuable contribution to marital property). Additionally, Julie argues that Gary's earning capacity is greater than hers because his income, between benefits and working part-time, is about twice that of hers, despite her working full-time. Further, unlike Julie, Gary also owns income-producing assets, namely, his retirement accounts.[7]

---

7. Julie also cites *Endres v. Endres*, 532 N.W.2d 65 (S.D. 1995), and argues that the circuit court's failure to place a value on the home was reversible error. But *Endres* has no application to the court's treatment of the marital home in this case. In *Endres*, the circuit court failed to place any value on items of marital property, and this Court determined the "[f]ailure to place a value on marital property [was] reversible error[.]" *Id.* at 70. Unlike *Endres*, the court valued the marital home and simply treated a large portion of the value received by Gary as nonmarital.

[¶42.] Gary responds that the court properly awarded him a greater share of the value of the home because he made substantially all the economic contributions to the home from premarital funds he owned. According to Gary, the court found that he was entitled to what he deems to be a "premarital credit" because he used the proceeds from selling his premarital business and home to pay off the mortgage.

[¶43.] In awarding the home to Gary, the court found that Julie made more than a de minimis contribution to the home and that it should be included as a marital asset under the Agreement because it was jointly owned. However, after making this determination, the court considered Gary's age and significant financial contributions to the home and treated only $120,000 as the value of the marital property received by Gary. The court deemed the remaining $360,000, approximately three quarters of the home's total value, as nonmarital property. In doing so, the court found that Gary used premarital funds to purchase the lot, paid all the mortgage payments from premarital funds or his income, and paid off the mortgage within three years from the sale proceeds of his business that he owned prior to the marriage. In treating a portion of the value of the home as marital property, the court found that Julie contributed her wages during the marriage to a separate account that did not go to the regular household expenses but made other noneconomic contributions to the home.

[¶44.] While the court did not make specific findings on each of the factors for the division of property, the court referenced these factors in its decision, and placed significant emphasis on Gary's economic contributions to the home. We cannot say, on this record, that the court abused its discretion by finding only a portion of the

home's value to be marital property and treating the remainder as nonmarital, given Gary's significantly larger contributions from his premarital assets toward the value of the home.

[¶45.] Next, Julie argues that the court's property division spreadsheet shows that the court determined some of the vehicles to be nonmarital assets, but the factual basis for its finding is not apparent from the record. She argues that all the vehicles owned by the parties, except for the 1979 Chevy Corvette and 2002 Harley Davidson VRSCA, are marital property because they were purchased during the marriage, from their joint bank account, and Gary failed to rebut the presumption that property acquired during marriage was marital property. *See Dunham*, 2022 S.D. 65, ¶ 39, 981 N.W.2d at 636 (quoting *Ahrendt*, 2018 S.D. 31, ¶ 8, 910 N.W.2d at 918). Julie further argues that when dividing the marital vehicles, the court erred by awarding the 2013 Ford F-150, 2006 Sno Pro Trailer, 2008 Ranger Boat, and 2008 Ranger Trailer, with a total value of $44,000, to Gary without including their corresponding values in calculating the total sum of marital property he received. Julie argues this error resulted in Gary receiving substantially more than the 50/50 split the court appears to have intended for the marital assets, other than the house.[8]

---

8. According to the joint property spreadsheet used by the court, the net marital asset value was $214,262. This includes the $44,000 value the court placed on the four vehicles. However, when calculating the value of the marital property awarded to each party, the court calculated that Julie received $35,482 while Gary received $134,535. The court equalized this difference by requiring Gary to pay Julie $49,526, but Julie argues this did not include the $44,000 value of the four vehicles received by Gary, but not equalized by the court.

(continued . . .)

[¶46.]     Gary acknowledges that the court erred on the spreadsheet, but not in the manner asserted by Julie. Instead, he argues that the undisputed proof shows the four vehicles at issue were purchased with nonmarital assets, and the court should not have listed them as marital property. Nonetheless, Gary contends that in calculating the value of the marital assets received by Gary, the court properly excluded them as nonmarital property. He argues that he was entitled to a premarital credit for the four vehicles because they were purchased prior to the marriage.[9]

[¶47.]     The spreadsheet shows that the parties owned several vehicles at the time of the divorce. Julie agreed in her testimony that Gary owned a 1979 Corvette and a Harley Davidson motorcycle at the time of the marriage and that he should receive both vehicles as nonmarital. Julie testified, however, that the other vehicles were purchased during the marriage and should be treated as marital assets. On appeal, Julie challenges the circuit court's failure to include the Polaris snowmobile and trailer received by Gary, which were purchased during the marriage.[10]

_____

(. . . continued)

9.     Gary also argues this issue was not preserved and should be deemed waived. *S.D. State Cement Plant Comm'n v. Wausau Underwriters Ins. Co.*, 2000 S.D. 116, ¶ 27, 616 N.W.2d 397, 407–08. Julie objected to the court's valuation to the extent that it was inconsistent with her proposed division and valuation set forth in her proposed property division spreadsheet. We deem that Julie's objection sufficiently preserved the issue for appeal.

10.    As a part of the property division, Julie received a 1998 Corvette, a travel trailer, and a Toyota 4Runner that the court valued as marital assets. The spreadsheet shows that the court deemed a portion of the value of two Ski Doo snowmobiles and another Harley Davidson motorcycle as marital assets

(continued . . .)

However, the court consistently treated the snowmobile and trailer on the spreadsheet as nonmarital. Additionally, this determination is supported by the only evidence offered concerning these assets, as Gary testified that he purchased the snowmobile and trailer during the marriage from the sale proceeds of two snowmobiles he owned prior to the marriage.

[¶48.]        There is an inconsistency in the court's treatment of the 2013 F-150 pickup, a snowmobile trailer, and a 2008 Ranger boat and trailer which are included in the marital asset column, but then not included in either party's asset column in the court's property division. This suggests that the court ultimately determined that these assets were nonmarital and this determination is supported by the undisputed evidence. Gary testified he bought the F-150 during the marriage by trading in a pickup he owned before the marriage. Upon receipt of the final contract payoff from his premarital business, Gary testified that he used the remaining funds to pay off the pickup. Gary also claimed that he purchased the snowmobile trailer using the remaining contract proceeds. In addition, Gary testified that he bought the Ranger boat and trailer during the marriage, using the proceeds from the sale of an Indian Chief motorcycle that was listed on the premarital agreement as an asset Gary owned before the marriage. Julie failed to put on any evidence that she made any contributions to these vehicles. Given the unrefuted evidence from Gary about the source of funding for these vehicles, we cannot say the court abused its discretion in excluding these assets as nonmarital.

---

(. . . continued)
         and awarded these assets to Gary. Neither party has raised an issue with
         the court's treatment of these vehicles.

Any error by the court initially treating the assets as marital property or erroneously placing them in the wrong column was harmless. *See* SDCL 15-6-61.

[¶49.]    Finally, Julie challenges the court's determination that Gary should receive the entire value of his individually owned retirement accounts as nonmarital property. The court's findings of fact reflect that it applied the Agreement in concluding that Gary's retirement accounts were nonmarital property. Based upon our determination that the Agreement applied to the divorce, the court did not error in this conclusion.

[¶50.]    Affirmed.

[¶51.]    KERN, SALTER, DEVANEY, and MYREN, Justices, concur.